MONROE, C. J.
Plaintiff brought two suits, the one, in her own behalf, and the other, as tutrix of her minor children, against the New Orleans Railways & Light Company and the New Orleans Gaslight Company, in solido, for the recovery of damages sustained by reason of the death of the husband and father through the alleged negligence of the gaslight company, in allowing a certain “Pintsch” gas, manufactured by it, to escape from a defective pipe, whence it is said to have found its way to a refriger *547 ating or cooling room of tlie National Packing Company, in which, the decedent was working, and there to have exploded; and, through the alleged negligence of the railways company, in so handling the electric current generated by it as to produce the defect in the gas pipe by electrolytic decomposition. The suits were consolidated, and there was a verdict and judgment against the gaslight company, in favor of the plaintiff, individually, for $5,000, and against the same defendant, in favor of plaintiff, as tutrix, for $6,000, from which plaintiff and the gaslight company appealed.
Plaintiff admits, in her testimony, that, after the death of her husband, the National Packing Company paid her, through her attorney, the sum of $250, as an “amount due to this accident,” and this suit was instituted some three months later.
We are not informed as to the basis upon which indemnity was demanded of the packing company, but the testimony suggests the inference that it was; that the accident was the result of an explosion of ammonia gas, generated in the plant of that company.
Plaintiff has dismissed her appeal from the judgment rejecting her demands against the railways company, and the controversy that we are here to consider involves only her claims against the gaslight company, as to which she prays for an increase in the amounts awarded.
It appears from the evidence that the decedent, Ferdinand Becker, was employed by the packing company as an engineer, in charge of its plant, at the corner of Tchoupitoulas and St. Joseph streets, in this city; that he had had an experience of 23 years, and was regarded as a very careful man, and an expert; that on the morning of July 5, 1911, when the employes came to their work, they observed a peculiar odor, which was attributed by Mr. Collins, the manager, and Mr. Becker, the engineer, to leakage of the ammonia gas, generated in the plant. Miss Sullivan, a young lady employed in the office, and called as witness for plaintiff, testifies as follows upon that subject, to wit:
“Q. Do you recall anything unusual? Did you smell anything there on the 4th or the 5th of July, 1911? A. Tes, sir; when I came down to work in the morning, about half past 8 o’clock, there was a peculiar odor, and, as I came in, I asked Mr. Collins, where was Mr. Becker, and Mr. Collins told me not to be a bit uneasy; there was just an ammonia leak. * * * That was in the morning of July 5th, about half past 8 o’clock. * * * Mr. Becker came into the office (between half past 1 and a quarter to 2 o’clock), and he requested Mr. Collins to send for the Armour Company’s engineer, that he was unable to locate what the trouble was, and he evidently had gotten an inferior drum of ammonia.”
The witness than called up the Armour Packing Company, whose plant was near by, and Mr. Collins telephoned (quoting the testimony of Miss Sullivan):
“They evidently gave us an inferior drum of ammonia, and to send their chief engineer over, so that they could find out the trouble; that our engineer was unable to locate the cause.”
In the same connection, we quote the following from the testimony of Mr. Broadmeyer, another employe of the packing company (also called as a witness for plaintiff), concerning an occurrence which had taken place shortly before that above referred to and upon a floor and in a part of the building other than where the explosion occurred a few hours later, to wit:
“Q. Did you have a conversation with Mr. Becker that morning? A. I did. Q. Was there anything that occurred in that conversation that fixes the fact in your mind that you had that conversation? A. Yes, I remember, during that conversation, Mr. Becker and I were speaking about different sorts of meat to put in the smokehouse for the day. During that conversation, him and I heard a bubbling noise, which could be heard plainly, and, to find that noise, Mr. Becker takes a match and lit it underneath the water pipe, and he dropped it into the drain bole. It flashed up and blazed fire. * * * Q. What did he do? A. He took a mop and put it out. * * * Q. Was that the drain that the engine floor drained into? A. Yes, sir. * * * Q. Do you know what water runs in *549 to the drain? A. There is two vats upstairs, the soaking vat, that drains in that hole, and the ham boiling vat, and a small, inch and a half, or quarter, drain, drains in there too. I can’t say about any more.”
Resuming the narrative of events, following the telephone message to the Armour Packing Company, Mr. Corwin, the engineer of that company, responded, to the message, and he and Mr. Collins and Mr. Becker began an investigation, which led them into the cooling room, on the second floor. Just at that moment, however, Mr. Collins was summoned to the telephone, on the first floor, and he answered the call, leaving the other two men in the cooling room, and it was then that the explosion occurred. It appears that they were endeavoring to find the leak, in the pipes, charged with ammonia, with which the room was equipped, and, for that purpose, were making use of a lighted “sulphur candle.” Mr. Collins, however, after testifying that Becker was an experienced expert and a careful man, says:
“I would not have permitted Mm (to), nor did he, use any sulphur candle, in my presence. I emphatically warned them not to use any matches or other light.”
The cooling room is described as “a room within a room”; that is to say, it was in the interior of the building and had no windows, and but one door, which was a heavy one, that was kept closed save when it became necessary to open it in order to admit or to take out the stock or for some special purpose, such as that for which it was opened upon the occasion here in question. We infer that there were some apertures (probably in, or about, the ceiling), for ventilation, and there was a drainage pipe (the inlet of which was covered with a grating) leading from the floor to, and beneath, the floor below, and beneath the sidewalk on St. Joseph street, to an open gutter, where it had its outlet; that portion of it which extended under the sidewalk being of terra cotta and provided, as we understand the testimony, with two “traps,” intended to exclude sewer gas from the cooling room. Beneath the same sidewalk, and parallel therewith, about seven feet from the property line and buried two feet in the ground, and perhaps half that depth below the terra cotta drainage pipe, was a two-inch pipe, through which the gaslight company conveyed “Pintseh” gas to .a railroad depot on the river front, where it supplied the gas for the illumination, as we assume, of passenger cars. The pipe was incased in close plank boxing, measuring 16x16 inches, which, in turn, was filled with cement, or concrete. But it appears that the neighborhood was the home of the packing companies, that the ammonia discharged from their plants had so saturated the ground that the shoes of laborers who made excavations therein were destroyed by it, and that the skin was eaten from their hands. To quote from the testimony:
“The leather of their shoes was actually eaten up. When the boys came in contact, with their bare hands in the soil, it actually ate the skin off their fingers and made them raw.”
And the destructive effect of the ammonia was not confined to the shoes and hands of the laborers; it extended to the pipes of the defendant, and to the cement in which they were inclosed. Referring to the pipe here in question, defendant’s superintendent of construction says, in his testimony:
“Yes, at various times we had to change it from the sidewalk to the street, to get away from the ammonia. * * * This line was laid on the downtown sidewalk, and we changed and switched across the street, and went on the other side,” etc.
There had theretofore been leaks in the pipe on several occasions and ■ at several places, other than those in question, and, on July 4th and the following day, when the accident occurred, the odor of gas in front of the plant of the National Packing Company *551 was quite perceptible, though it was mixed, as we conclude, with that of ammonia and with other odors ,with which the neighborhood appears to have abounded. The witnesses testify that there was always a smell of ammonia wherever there were excavations in the gutters in front of the packing houses, that there was a distillery in the neighborhood from which refuse was discharged into the gutter, and that there was an odor therefrom concerning which one of them testified as follows:
“Q. Is there any odor from that refuse? A. Yes, sir; there is. There is an odor that I cannot exactly describe, that contains molasses and other ingredients, and I know there'is a considerable quantity of molasses in it, which I can only state has a sweet, sickening kind of a smell.”
Another witness gives the following testimony:
“Q. In what did that soil differ in so far as it had any effect on you. A. When you got down there with your shoes, they were ruined, and your fingers got eaten up with ammonia in the ground. I found that in the packing houses, only. i!: * * Q. Was there any odor of ammonia from any of those packing house plants? A. It was a mighty peculiar odor that used to come along the gutter. Q. This is a neighborhood where they handle meats and ammonia, and where there are warehouses and some machinery shops? A. Yes, sir. Q. Is it not a fact that in this particular neighborhood there are all kinds and varieties of odors? A. Yes, sir.”
The explosion occurred, about 2:30 o’clock in the afternoon and was followed by a fire, which brought the fire marshal and his deputy, and others, to the scene, and the deputy marshal • testifies that he observed a peculiar odor about the premises, like gas, though he was unable to say what kind; that “he smelled gas coming in at the door” (referring to the door of the building on the ground floor); that he returned on the following morning (July 6th), and suggested that an excavation be made in front of the door, which was done, with the result that it was discovered that there was a leak in the gas pipe. He was asked whether he had examined the drainpipe which extended from the cooling room to the gutter, and through which the gas is supposed to have reached the cooling room, and he replied as follows:
“A. Yes, I did; in the cooling room. * * * About 8:45 (on the morning of July 6th) I went to the plant and went over the ground again, in company with Mr. Palms, of the gas company. We tried to locate how the gas got into the building, and placed our nostrils close to the pipe in the cooling room. The cooling-room that they had the fire in that morning was the one they had trouble the next morning; and, when you got close to the drain, you would not smell gas, but the moment you rose up you got it, and it led me to believe that it did not come through the drain; and, while standing on the outside, discussing this, a whiff came into the window, and I said: ‘Here it is. Coming in here. It is right out in front.’ ”
The witness further says:
“I know the smell of ammonia. I don’t know that I ever' came in contact with ammonia and other gases. I am not an expert on gas. Q. Did this smell like ordinary illuminating gas? A. No, sir; it smelled sickening- to me. 1 got about a dozen whiffs of it, trying to find it on every drain about the building.” -
1-Ie was, however, of the opinion that the odor that he found in the cooling room was the same as that which emanated from the excavation where the leak in the gas pipe was discovered.
Mr. Palms, defendant’s superintendent of construction, to whom the witness above quoted refers, testifies that he received notice that the fire marshal was under the impression that the fire had originated in an explosion of gas, and that he repaired to the scene, on the morning of July 6th, and participated in the investigation then made; and, further, as follows:
“Q. Did you go into the cooling room? A. Yes, sir. Q. Did you make any investigation in that cooling room? A. Wo did. Q. What was the result of the investigation? A. We could not detect any odor of gas in the cooling room, with the exception of a little odor of gas which was carried in the windows and doors from St. Joseph street. Q. Mr. Callahan (the deputy fire marshal) stated that he had placed his nose to the entrance to this drain in the cooling room, and that he could smell no gas, and, when he took his nose away from that drain hole, two or throe feet, he could smell *553 some gas. Did you smell the drain? A. Xes, I did. Q. Could you smell anything in the drain? A. Absolutely no odor of gas 'whatever. Q. Could you smell it when you removed your nose from the drain? A. Occasionally. Q. Was the smell a continued smell? A. No, sir; you could smell it, at times, in places, and, again, you could not smell it. It depended how the wind carried the gas through the open window.”
It was shown that» a hole, into which a match could be inserted by the use of force, was found in the under side of the gas pipe, and that there was also discovered a hole, about an inch in diameter, in the upper side of the drainage pipe, approximately, over, and probably from 9 to 12 inches distant, through packed earth, from, the boxing which inclosed the gas pipe. And the theories propounded on behalf of plaintiff are that the gas which escaped from the hole in the lower side of the gas pipe, first ascended and then descended through the hole in the upper side of the drainage pipe, and, instead of making its exit through the nearby outlet, into the warm air of the street, passed through that pipe into the cooling room; or, that it followed the pipe, on the outside, into the cooling room; and that, in either case, it may have become mixed with gas that may have entered through the occasionally opened door, and hence the explosion.
A careful consideration of all the testimony leads us to the conclusion that the theory first maintained is destroyed by the testimony of the deputy fire marshal (a witness called by plaintiff) and of defendant’s superintendent of construction, who were the only witnesses who actually tested the question and who say, positively, that there was no gas entering the cooling room through the drainage pipe. And our conclusion upon that point is confirmed by the testimony of the distinguished head of the Department of Chemistry in Tulane University of Louisiana, who, speaking as an expert, and without contradiction, said that it was improbable that the gas should have passed, without condensing and dropping, through the traps and the cold atmosphere of the drainage pipe, into the still lower atmosphere of the cooling room. The other theories are purely conjectural and find not even the shadow of support in the evidence. Dr. Metz, the expert chemist to whom we have referred, also testified that ammonia gas will explode when combined with oxygen in certain proportions ; and we may add that, in our opinion, the testimony of some of plaintiff’s witnesses, to the effect that the odor in the cooling room appeared to them to be the 'same as that which they observed in the trench where the leak in the gas pipe was found, may readily be accounted for by the fact that the odor, whether in the cooling room or in the trench, may have been dominated by the ammonia gas, with which most of the witnesses were unfamiliar, but which the manager of the packing company and the unfortunate engineer are shown to have recognized as the trouble, the source of which they were seeking. To recover damages for injuries sustained through the alleged fault of another, the fault, and the connection between the fault and the injuries, must be shown, with reasonable certainty. There can be no recovery where only the possibility, or the probability, of such fault and connection is shown. The evidence herein fails to make the case alleged against the defendant reasonably certain, and plaintiff cannot recover.
It is therefore ordered that the judgment appealed from be set aside, and that plaintiff’s demands, individually and as tutrix, be rejected, and these consolidated suits dismissed, at her cost in both courts.