(75 South. 837)

No. 22039.

FEELY et al. v. NATIONAL PACKING CO., Limited, et al.

(June 11, 1917. Rehearing Denied June 30, 1917.)

*(Syllabus by Editorial Staff.)*

1. GAS ⚖═══20(2)—INJURIES FROM EXPLOSION—WEIGHT OF EVIDENCE.

In an action against a gaslight company for the death of plaintiff's husband caused by an explosion in a cold-storage establishment, evidence *held* to show that the explosion was due to gas, and not to ammonia escaping from the pipes of the cold-storage plant.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 16, 17.]

2. GAS ⚖═══18—INJURIES FROM EXPLOSION—LIABILITY.

Where a gas company, whose pipes conveying Pintsch gas passed along and under the banquette in front of a cold-storage plant, was notified, several hours before an explosion, of a strong odor of gas pervading the cold-storage plant, and requested to have an immediate investigation made, it should have done so, and its failure in that respect was negligence, as gas companies are held to a very high degree of care.

3. GAS ⚖═══19—INJURIES FROM EXPLOSION—CONTRIBUTORY NEGLIGENCE.

Persons killed by an explosion of gas in a cold-storage plant while searching for the cause of an unusual odor were not negligent in striking a match, where there was apparently no other possible cause for the odor than an ammonia leak somewhere, and the usual recognized way of investigating for an ammonia leak was to apply a lighted sulphur taper to the places where the leak might be suspected to be.

[Ed. Note.—For other cases, see Gas, Cent. Dig. § 15.]

4. GAS ⚖═══16—INJURIES FROM EXPLOSION—LIABILITY.

Where the defendant packing company, being unable to discover the cause of an unusual odor in its cold-storage plant, asked another packing company to send its engineer to locate an ammonia leak, and while searching for the cause of the odor he was killed by an explosion of gas entering the building through a drain pipe, the packing company was not negligent in failing to warn him not to strike a match or to tell him that the odor might proceed from some cause other than ammonia, as no one knew the origin of the odor any better than he did, and he knew that his services had been requisitioned because the others had to acknowledge their incompetence in the matter.

[Ed. Note.—For other cases, see Gas, Cent. Dig. § 13.]

5. DEATH ⚖═══99(4)—DAMAGES FOR DEATH—EXCESSIVENESS.

A person injured by an explosion of gas so that he died eight days later was burned internally as well as externally, and suffered greatly. He was 54 years old, with a life expectancy of 18 years, a good husband and father and earning $150 a month. He was survived by a widow 54 years old and a child of 13. The jury allowed $15,000 to the widow and $5,000 to the child. *Held* that the allowance to the widow was excessive, and should be reduced to $10,000.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125, 126, 129.]

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by Bridget S. Feely and others against the National Packing Company, Limited, and others. Judgment for plaintiffs, and defendants appeal. Judgment set aside and suit dismissed against one defendant, and judgment reduced against the other defendant.

Charles F. Buck, James Legendre, and Edward Rightor, all of New Orleans (H. Generes Dufour, of New Orleans, of counsel), for appellant New Orleans Gaslight Co. Miller, Miller & Fletchinger, of New Orleans, for appellant National Packing Co., Ltd. Armand Romain, of New Orleans, for appellees.

PROVOSTY, J. Plaintiff sues in damages for herself and her minor child because of the sufferings and death of her husband, Leroy Corwin, resulting from an explosion in the cooling room of the cold-storage establishment of one of the defendants, the National Packing Company. The other defendant is the New Orleans Gaslight Company.

On the morning of the 3d of July an unusual and peculiar smell pervaded the said establishment. It was different from the smell of ammonia, with which the inmates were familiar, and yet it was somewhat like it. Some thought it was like illuminating gas. All the doors and windows were opened to let it out. The next day, the 4th of July, being a holiday, the place was not opened for business; but the shipping clerk went there, and found the smell more pronounced than the day before—very strong. On the 5th the odor was still stronger. Between 9 and 10 o'clock the manager informed the gaslight company, over the telephone, of the prevalence of the odor of gas throughout his building, and asked that an investigation be made immediately. The engineer of the establishment, Becker, used every endeavor in vain to discover the origin of the odor. In the after-

noon, at about half past 2, the manager requested the Armour Packing Company, in the next square but one, to send its engineer to locate an ammonia leak. This engineer was Corwin, the husband of plaintiff. He came over at once, and he and Becker, the engineer of the National Packing Company went through the building, trying to locate the source of the odor, and finally entered the cooling room, followed by the wagon driver of the establishment who was going in to get some goods, and the cooling room door was closed behind them. The driver immediately after entering separated from the other two, and within a minute or so the explosion occurred. Their screams attracted attention on the outside; the cooling room door was broken open; and the three men were rescued; but Corwin and Becker were so burned that they died within a few days. The driver survived, and testified in the case. However, as he had lost sight of Becker and Corwin after separating from them, he could give no information on the important point of whether or not they had struck a match. He testified, however, that Corwin held tools in both hands; so that, if a match was struck, the inference would be that it was by Becker.

[1] The gaslight company attributes the explosion to ammonia escaping from the pipes along the inner walls of the cooling room. It produced one witness, who testified that he was by profession a consulting engineer, whose functions consisted in the designing of plants, in advising as to their operation, and curing defects and remedying troubles, and that this brought him in touch with refrigerating plants, and that he had had considerable experience in that line, and had had a great deal to do with ammonia; that pure ammonia was not explosive, but that impure ammonia was, especially what is called rotten ammonia, which is a mixture of ammonia with lubricating oil; that he knew of one explosion having occurred from that

cause; that he was not present at it, but had made an investigation, and come to that conclusion.

Against this, there is the testimony of a consulting engineer and chemist, and of another chemist, to the effect that ammonia is not explosive, except under conditions not present at the explosion in this case; and there is the testimony of the chief engineer of the Armour Packing Company, of a contracting refrigerator engineer of 23 years' experience, of the then superintendent of the National Packing Company, and of the manager and consulting engineer of the Crescent City Ice Company, that the usual way of locating ammonia leaks in cooling rooms, when the leak is not large enough to be located from the hissing of the escaping gas, is by means of a sulphur taper, and that for lighting this taper a match is struck or a lighted candle is carried; that this is being done constantly; and that they have never heard of an explosion resulting therefrom.

Upon this evidence the conclusion is easy that the explosion was not from rotten ammonia, and that another cause has to be found for it. No gas pipe led into the building; but a 2-inch pipe conveying a gas known as Pintsch gas, passed along and under the banquette in front of the building, and, on investigation, after the explosion, the discovery was made that there was a leak in this pipe, and that just above this leak was the 6-inch terra cotta drain pipe of the cooling room, which had a hole in it, so that it was possible for this Pintsch gas to have got into the cooling room.

The gaslight company argues against the probability of this having happened. The gas pipe was incased in cement four inches thick, and additionally in a wooden boxing; the gas leak was only the size of a match; the gas in order to reach the hole in the drain pipe would have had to travel upward through closely packed earth for 9 to 24 inches, and then into a 1-inch hole on the top of the terra cotta pipe, and for going up through the drain pipe would have had to overcome the resistance of a bell trap acting as a water sieve, and of the column of cold air in this pipe.

All this is very true, but the testimony of the superintendent of the gas company is that the pressure in this Pintsch gas pipe is very much greater than in ordinary gas pipes, so much so that an inspector goes along the Pintsch gas lines every day to detect leaks; and also the evidence shows that when the Schillinger pavement of the banquette was removed the smell of gas was very strong, so that there can be no question but that the gas did pass through the concrete and wooden incasements, and did permeate the adjoining soil, seeking a vent; and so far as the supposed resistance of the bell trap is concerned, it was entirely offset by the like resistance of another bell trap in the drain pipe, through which the gas might have got into the drain pipe, and the gutter where this drain pipe had its outlet. It is also said that the gas would more likely rise into the warmer atmosphere of the gutter or street than into the colder atmosphere of the drain pipe; but this is against the law of physics, the colder and heavier the atmosphere the more easily will a lighter gaseous body rise in it.

In view of the evidence establishing positively that this explosion could not have come from the ammonia, and in view of the absence of all source from which it could have come other than this Pintsch gas, and in view of the fact that to several of the witnesses the odor in question was that of Pintsch gas, we have come to the conclusion that this Pintsch gas was the cause; and the question must be as to whether there was any negligence on the part of the gas company.

[2] The pipe in question was properly laid, and was duly inspected; but when, in the

morning of the 5th, several hours before the explosion, the gas company was notified of this strong odor of gas pervading the establishment in question, and was requested to have an immediate investigation made, it should have done so; and its failure in that regard was negligence. Perhaps no very grave negligence; but gas companies are held to a very high degree of care:

"It is a well established rule that a higher degree of care and vigilance is required in dealing with a dangerous agency than in the ordinary affairs of life or business, which involve little or no risk of injury to persons or property, and in view of the highly dangerous character of gas and its tendency to escape, a gas company must use a degree of care to prevent the escape of gas from its pipes commensurate to the danger which it is its duty to avoid, and if it fails to exercise this degree of care and injury results therefrom, the company is liable, provided the person suffering the injury either in person or in property is free from contributory negligence." 12 R. C. L. 905.

[3] It is said that the immediate cause of the explosion must have been the lighting of a match, and that this lighting of a match in this cooling room, supposed to be full of a gas of some kind which might explode, was negligence on the part of Becker and Corwin, especially that they had been fully warned by the manager of the establishment not to strike a match.

[4] We readily assume that a match was struck; but we do not find that the act constituted negligence. The evidence overwhelmingly shows that, while the smell in question was unusual, yet that there was apparently no other possible cause of it than an ammonia leak somewhere, and that therefore there was nothing to do but to investigate for an ammonia leak, and that the usual recognized and accepted way of doing this was to apply a lighted sulphur taper to the places where the leak might be suspected to be. The doing of this was therefore not negligence. Indeed, plaintiff seeks to hold the packing company on the ground that Corwin, having been told that it was to discover an ammonia leak he was being called, should have been advised by the packing company that the odor in question might proceed from some cause other than an ammonia leak; and that the failure of said company so to advise him was negligence on its part.

The evidence shows that Corwin was warned by the manager of the packing company not to strike a match; but even if this warning had not been given, the case would not stand differently as to the packing company. For no one knew what was the origin of this odor any better than Corwin himself did; he was as good a judge in the matter as any one else, and had as good an opportunity of judging. Indeed he knew that his services had been requisitioned for the very reason that the others had had to acknowledge their incompetence in the matter.

The evidence in this case is different on the essential points from that in the suit of the widow of Becker, growing out of the same occurrence (Rohr v. New Orleans Gaslight Co., 136 La. 546, 67 South. 361); hence the difference in the conclusion of the court.

[5] Corwin was 54 years old; had an expectancy of life of 18 years; was a good husband and father, and was earning $150 a month. His sufferings must have been very great; he was burnt internally as well as externally; and the latter burns were such that the flesh would come with the remnants of clothes when these were sought to be taken off. He survived for eight days. At the date of the accident the widow was 54, and the minor, Leroy C. Corwin, 13. The jury allowed $15,000 to the widow, and $5,000 to the minor. This allowance to the widow is higher than this court has heretofore been allowing in such cases. We think it ought to be reduced to $10,000.

It is therefore ordered, adjudged, and decreed that as against the National Packing Company the judgment appealed from be set aside and plaintiff's suit dismissed, and that

as against the New Orleans Gaslight Company the said judgment be reduced to $15,000, whereof $10,000 in favor of Mrs. Bridget S. Feely and $5,000 in favor of the minor Leroy Corwin, and as reduced be affirmed; and that Mrs. Bridget S. Feely pay the cost of this appeal.