No. 3552

Second Circuit

PHILLIPS v. CITY OF ALEXANDRIA
MADERE v. CITY OF ALEXANDRIA
BROCK v. CITY OF ALEXANDRIA

(July 1, 1929. Opinion and Decree.)

White, Holloman and White, of Alexandria, attorneys for Mrs. Mary O. Phillips, plaintiff, appellant.

K. Hundley, of Alexandria, attorney for Sim Madere, plaintiff, appellant.

Overton and Hunter, of Alexandria, attorneys for Mrs. Clara Brock, plaintiff, appellant.

Thornton, Gist & Richey, of Alexandria, attorneys for defendant, appellee.

PER CURIAM. The City of Alexandria distributes and sells natural gas for domestic and other purposes, its distributing system consisting of mains, pipes, meters, cut-offs, etc.,—all owned by it. One of its mains runs along Wheelock Avenue on which one of the plaintiffs, Mrs. Mary O. Phillips, owns a tenant house, municipal number 532, which was piped for gas and connected with the city main at the curb by a service pipe.

On January 2, 1928, a roomer in this tenant house struck a match preparatory to lighting an oil lamp, when a gas explosion took place which wrecked the house, killed one of the inmates and seriously injured two others. Mrs. Phillips, the owner of the house, and the two inmates who were injured by the explosion, brought separate suits against the city for damages. The three cases were consolidated for the purposes of the trial. Their demands were rejected; and they have brought the cases up for review.

Mrs. Phillips had her house piped for gas originally in the latter part of 1926. This was done at her expense by a plumber of her own selection, but under a permit granted by the city. She owned all pipe and fixtures, including the service pipe from the main at the curb to the house. When the house was piped and the service pipe laid, the city was notified of the completion of the work and thereupon the plumbing was inspected and approved by the city inspector. The house was burned, or partially so, in October or November, 1927, and was immediately rebuilt under a permit issued by the city building inspector, although no permit was applied for or granted by the gas department for repairs, changes or additions to the gas plumbing, presumably because the house was burned only to the floor and it was found that the gas piping was left uninjured. Upon the completion of the repairs to the house, Mrs. Phillips, the owner, leased it to Mrs. Pugh, who moved in during the latter part of December. As stated, no permit was granted for repairs or additions to the gas plumbing, and the city was not notified that any had been made, and the gas department was not requested to re-inspect the plumbing after the repairs to the house had been completed. During the time the house was undergoing repairs, the gas was cut off at the main, but it was cut off prior to the burning of the house because the tenant at that time failed to pay the gas bill.

After Mrs. Pugh moved into the house, she used wood stoves for heating and an oil stove for cooking, but later decided to install gas stoves for heating and, to that end, purchased some two or three gas heaters from a dealer named Darby, who, on January 2, 1928, the day the explosion occurred, carried them to the residence, set them up and connected them with the gas pipes. Darby was not a licensed plumber and had no permit from the City Gas Department to install gas fixtures, as required by a city ordinance, and neither he, nor anyone else, notified the gas office that such fixtures had been installed. Immediately after the stoves had been installed and connected by Darby, Mrs. Pugh's daughter, Mrs. Brock, telephoned the city gas office and requested that gas be turned on at municipal num-

ber 532, Wheelock Avenue, in the name of the tenant, Mrs. Pugh. The only request made was that gas be turned on. At about four o'clock, Mr. Kappel, city gas inspector, after finding that the fee for turning on the gas had been paid, went to the residence and turned it into the service pipe leading to the house through a valve or cock at the curb, which valve is under the exclusive control of the city. There is, however, another valve and cut-off on the service pipe at the point where it enters the house and is placed there for the convenience of the consumer, and is left under the control of the occupant of the house. Gas can be let into or cut off from the house through that valve by anyone, with the use of a wrench, after it has been turned on by the city through its valve cock at the curb.

When Mr. Kappel opened the valve at the curb, he went to the valve at the edge of the house and saw that it was closed, so that no gas could pass into the house, and immediately left the premises. After he left, someone—the testimony not showing who—opened the valve at the house and let the gas in, as the gas heaters were to be used. Between six and seven o'clock of the same day, Mr. Madere, while in the dining room, which adjoins the kitchen, with a door between, struck a match and a terrific gas explosion followed.

It is conceded by both sides that the gas which had accumulated in the house and which caused the explosion had escaped through an open, uncapped outlet in the kitchen, which neither Mr. Darby, who installed the heaters, nor any of the occupants of the house knew anything about. This opening had been left for the installation of a gas cookstove. Presumably, the tenant who had previously occupied the house left the opening uncapped when she moved from the premises.

These plaintiffs predicate their cause of action against the city upon the proposition that it was grossly negligent in two respects; first, that the City Gas Department had notice prior to the explosion that gas was escaping into the house and was asked to send its inspector at once, and failed to do so; and second, that it was negligence on the part of the City Inspector to turn gas into the service pipe without first ascertaining that all gas outlets in the house were closed.

It is conceded that in distributing and selling natural gas to its inhabitants, the City of Alexandria was exercising a private, corporate function, and therefore was on the same footing in law as an individual or private corporation and is liable for damages occasioned by the negligence of its agents and employees. Further, if it be true, as alleged and as counsel argue, that the city's agents and employees were negligent in the handling of gas, there may be liability. On the other hand, if there was no negligence, there can be no liability.

Natural gas is an explosive and a highly dangerous substance, so that the city in handling it must be held to a degree of care commensurate with the danger. In view of that fact, if the employees of the city knew at the time the gas was turned into the service pipe at the curb that there was an uncapped gas opening in the house through which gas would escape, or if they became aware after it was turned on that gas was escaping into the house through such opening and made no effort to stop the flow and protect the occupants of the house, the city, we think, would be liable, even though it did not install the plumbing or the fixtures in the house and

did not at any time connect with the piping or disconnect therefrom any plumbing fixtures.

In order to fasten liability on the defendant, it is alleged and counsel for plaintiffs now contend, that the city had actual knowledge prior to the explosion that gas was escaping into the house in some manner unknown to the occupants, and that no effort was made to stop the flow. But they failed to prove that. The testimony offered in support of that point is not convincing. Mrs. Pugh's daughter, Mrs. Brock, who is one of the plaintiffs, lived about two blocks away. She visited her mother during the afternoon, after the gas was turned on and after the gas heaters were installed and connected by Darby. She says she heard a strange noise about the house which she could not account for, and that she went back to her own home and from there called the gas office by telephone and told an employee, Mrs. Pefferkorn, that she thought gas was escaping at her mother's home and to send an inspector at once. Her testimony that she did call someone and say something about the gas escaping is corroborated by two other persons who were boarding at her residence and who overheard what she said, but, of course, did not know to whom she was talking nor what was said at the other end of the line. But Mrs. Pefferkorn emphatically denies that she received such call and such request. Other employees of the office testified that they had received no such call. In view of the emphatic denial of Mrs. Pefferkorn and the others that such a call was received, and further, in view of the answer which Mrs. Brock says she received to her request, we think Mrs. Brock was given the wrong number by the telephone operator and that as a matter of fact she did not talk over the telephone to anyone connected with the gas office. Mrs. Brock says that the person who answered the call said in reply to her request that they "could not go around peoples' houses," or "we do not send people in peoples' houses."

An answer of that kind coming from anyone connected with the city gas office would have been wholly inconsistent with the custom adhered to by the department, it being shown that in every case when a complaint of this nature was received, the inspector did go to the premises and make an inspection. Knowing such to be the rule and custom, it is not likely that Mrs. Pefferkorn, or anyone else in the office, would have given such an answer. She and the other members of the clerical force in the department testified that in all cases where complaints are telephoned in, the one receiving the call notes the same on paper and places the notation on the inspector's "hook," and that it was his custom to go to his "hook" immediately on coming in to see of there were any calls for him.

While Mrs. Brock's testimony that she made some attempt, at least, to notify the gas office that gas was escaping at her mother's home is corroborated, yet there are circumstances which indicate very strongly that she did not suspect that the strange noise which she heard was caused by escaping gas. It was about four o'clock when she was at her mother's home and heard the noise. As a witness, she first said that she had no idea what it was. Evidently, it made little or no impression upon her mind. If she had thought it was escaping gas, it is passing strange that she did not mention the fact to Madere, who was sitting in front of an open fire at the time she first went to the house and heard the noise. Mrs. Brock left the house immediately and did not go back until about seven o'clock when she found

both her mother and Madere sitting before the open fire, exposed to the greatest danger, if, indeed, gas was escaping into the house. She says she was informed by someone in the gas office three hours before her last trip to see her mother that the gas department would not send its inspector and she admits that she made no effort to have anyone else go. She knew, therefore, that nothing had been done and yet, in the meantime, did not have sufficient interest to warn her mother and Madere of the danger which she knew existed—if gas was escaping into the house where open fires were burning and oil lamps lighted. Not only that, but when she went back about seven o'clock to see her mother, she said not a word to either her or Madere about having suspected that gas was escaping. She not only permitted her mother and Madere to be exposed to the danger which she knew existed, but she exposed herself by walking into the house and remaining there until the explosion occurred. Mrs. Brock was asked to explain her strange conduct in this respect, but said she could not do so.

The testimony offered to show that the city had notice that gas was escaping into the house and was asked to make an inspection, falls far short of conviction and we hold, therefore, that it had no such notice.

The second point involves the question whether it was negligence on the part of Kappel, the gas inspector for the city, to turn the gas into the service pipe at the curb without first ascertaining that all the openings in the house were closed.

The testimony shows that the city does not engage in the plumbing business. It does not install plumbing fixtures nor connect nor disconnect them with gas piping. The owner of this property had it piped for gas at her own expense by a plumber of her own choice, and owned not only the piping in the house, but the service pipe as well. When Mrs. Pugh had Darby install and connect up her gas heaters, she notified the gas office that she was ready to have the gas turned on and requested that the inspector be sent for that purpose. The inspector was not called upon to go into the house and we think, under the circumstances, it was not his duty to do so. If the inspector had been called upon to inspect the premises and had failed to do so, or if he had inspected them and overlooked an opening which was uncapped, we think he would have been negligent. But the only request made was that he turn the gas into the service pipe. Mrs. Pugh's request that the gas be cut in was equivalent to a declaration that she was ready for it, and, if it be said that, under the rules and ordinances of the city, she had a right to call for an inspection, she waived that right by failing to make the request.

The gas was cut off originally because the tenant failed to pay the bill, and, while the inspector knew that the request to have the gas turned on again came from a different person, he was not required to anticipate that the former tenant or anyone else would leave one of the outlets uncapped. ·

The case of Hebert et ux. vs. Baton Rouge Electric Co., 150 La. 957, 91 So. 406, 35 A. L. R. 245, is cited in support of the proposition that the gas company should see that all openings in a house are closed before turning on the gas. The holding in that case lends no support to plaintiffs' contention, because the facts are altogether different. In the cited case, the plaintiff and others moved into an apartment house and the gas company was called upon to make the

connection. Its inspector went into the apartment, looked into the kitchen for a gas stove outlet, but found none. But there was one uncapped and through it the gas escaped, causing the death of plaintiff's child. A Mrs. Sicard was present when the connection was being made by defendant's workman and, after the gas was turned on, she noticed an odor of gas and called the workman's attention to it. He assured her that the odor was from a gas pipe which he had opened. But the gas was escaping from an uncapped opening which, to quote from the opinion, "had been left open or uncapped by the workmen of the defendant company when they had disconnected the stove of the former tenants, some five months previously." The court held that the defendant was at fault and said:

"Especially so, in view of the admitted fact that the defendant company's custom was not to cap outlets when disconnecting the gas service and removing fixtures, and of the further fact that the defendant company had kept a record of having removed this particular fixture."

In the case at bar, the city's employees did not disconnect the fixtures of the former tenant nor did it install and connect those of the new tenant nor did they turn the gas into the house—but merely turned it into the service pipe so that it could be turned into the house in case the tenant desired to do so. As a matter of precaution and protection to property owners, the city by ordinance prohibits anyone from installing gas fixtures without a license and permit which are granted only after the applicant has been examined as to his knowledge with reference to such matters, and after specific instructions given by the city inspector. One of the specific instructions given by the inspector is that, after installing and connecting fixtures, the entire premises must be searched for other openings, and before leaving the premises, to ascertain if there are uncapped openings. Darby was not a licensed plumber and had no permit to install these fixtures, but, after the explosion, he did make application for a permit, which was granted. He himself testified that if he had been instructed by the city's gas inspector previous to the installation of these fixtures as he was later when he applied for the permit, he would have looked to see if there were any uncapped openings in the building.

It was not the city's fault that Mrs. Pugh employed an unskilled, unlicensed plumber to connect her fixtures. It would be going too far, we think, to hold that it was the duty of the city's employee to anticipate that a former tenant or anyone else would disconnect gas fittings and leave the openings uncapped.

Counsel for plaintiffs have cited many Louisiana cases involving injury by gas, but none of them are in point. For instance, they cited and quoted from the case of Feely et al. vs. National Packing Company, 141 La. 903, 75 So. 837. In that case the court found that the defendant company had been notified of a strange and unusual odor about the plant, suggestive of escaping gas, and, because no effort was made to locate the cause, it was held that defendant was liable.

We have read all the Louisiana cases cited, as well as those from other jurisdictions, and fail to find any case holding that it is a gas company's duty on cutting gas into a service pipe, so that it may be used by the owner of the premises, to go into the building and ascertain whether there are any uncapped openings, in the absence of any suggestion or knowledge that there are such.

We think this case is governed by the principle announced in the case of Okmulgee Gas Company vs. Kelly, 105 Okl. 189, 232 Pac. 428. We quote the following from that case:

"If the gas pipes and fittings are the property of the consumer, and there is no contractual duty resting on the gas company to inspect, the consumer, by application for gas service, assumes the burden of inspecting and maintaining the pipe and fittings on his property in a manner reasonably suited to meet the required service, and the company has the right to assume that these duties have been performed by the applicant." See cases and voluminous notes found in McClure v. Hoopeston Gas & E. Co., 303 Ill. 89, 135 N. E. 43, 25 A. L. R. 250; Reid v. Westchester Lighting Co., 36 N. Y. 322 140 N. E. 712, 29 A. L. R. 1247; and Prestonsburg Superior Oil Gas Co. v. Vance, 215 Ky. 77, 284 S. W. 405, 47 A. L. R. 483.

For the reasons assigned, the judgments appealed from are affirmed, with all costs in both courts.