(42 South. 483.)

No. 15,908.

LOWENTHAL v. VICKSBURG, S. & P. RY. CO.

(Nov. 26, 1906.)

1. CARRIERS — INJURY TO PASSENGER — EVIDENCE.

The suit was for damages.

The plaintiff was injured in a wreck caused by the derailment of a number of cars of defendant's train.

A broken wheel was the cause of the accident.

The car in which plaintiff was a passenger did not leave the track. Her contention is that she was injured in the break-up by the shock and jostle.

Passengers and employés of defendant did not see her at the moment. They were not injured, and felt no great shock. It is fair to presume that they had their own safety in view, and did not observe very closely. Plain-

tiff testified that she was injured. She is not directly contradicted.

There was a crack in one of the wheels which should have been found. It was not, although inspection was made a very short time before the accident. It was not a latent defect such as no reasonable care or skill could discover.

2. DAMAGES — EVIDENCE — CORROBORATING FACTS.

The testimony of plaintiff finds support in her physical condition since the accident. Physicians testify that her illness is traumatic neurasthenia, caused (it is the weight of the testimony of the physicians) by the accident.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, § 1177.]

(Syllabus by the Court.)

Appeal from First Judicial District Court, Parish of Caddo; Thomas Fletcher Bell, Judge.

Action by Flora Lowenthal against the Vicksburg, Shreveport & Pacific Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Wise, Randolph & Rendall, for appellant. Scott & Jones and Hall & Jack, for appellee.

BREAUX, C. J. This suit was instituted against the defendant by plaintiff to recover the sum of $10,000 for injuries suffered by plaintiff, owing, as she avers, to the fault and negligence of defendant.

Plaintiff and her husband, on their way to Vicksburg, Miss., were passengers on defendant's road.

On leaving Shreveport, they took their seats in the day coach, part of one of defendant's fast trains.

This was in the afternoon about 3 o'clock. Within a short time after they had left the city of Shreveport, while they were passing the town of Haughton, at a high rate of speed, the front wheels of the train derailed, and the train was thereby wrecked.

Petitioner was thrown violently against the seats, and in the jostle suffered injuries.

Before the accident she was a healthy woman, strong, stout, did her cooking and housework. After the accident she became thin,

emaciated, unable to work, and required the frequent visits of her physician.

Her disease was diagnosed as being traumatic neurasthenia.

It appears that one of the wheels of the train was cracked. The wheel broke in two pieces while the train was under headway, and part of the train left the track.

Defendant does not admit the fault and negligence charged. It sought to sustain its defense by urging that the wheels of the train were manufactured by a reputable and experienced company; that these wheels were manufactured of material of average quality; that the construction was good; that an inspection had been made at Shreveport before the train left that place on the day of the accident; that the conductor in whose charge the train was, and the engineer, as defendant's agents, were capable and intelligent workmen.

The train in question consisted of seven coaches, besides the engine and tender. The dining car was in the rear, the Pullman next, and the ladies' coach next.

Plaintiff was a passenger in the ladies' coach. The train was running at about 45 miles an hour at the time of the accident.

The baggage car and the mail car were badly damaged. In the mail car two clerks were killed. The combination car was next. In it were a number of negroes, several of whom were bruised. The smoker was occupied by a number of passengers. It also left the track, but no one in this car was injured. The ladies' car did not leave the track, and was not damaged, neither was the sleeper, nor the dining car in the rear.

The plaintiff testified that she was sitting in the ladies' car at the moment of the accident, that she does not know what struck her. She recalled that two men helped her to return to her feet after she had fallen forward against the seat in front of her. She was very much agitated, and did not know that she was hurt. She states that the cushion on which she was sitting was pressed back. It was at that moment that two men pulled her back.

There were two physicians present, one in the employ of the defendant road, for the purpose of administering relief. She sought the advice of neither.

She remained until about 11 o'clock the night after the accident, and then left for Vicksburg, occupying a seat in the day coach, arriving at Vicksburg the following morning, and during this time she did not mention that she was hurt in the wreck or ask for relief. The day after she arrived in Vicksburg she called on a physician, who prescribed for her, but made no physical examination, and did not treat her for physical injuries.

After remaining one week at Vicksburg with her friends, she returned to her home in Marshal, Tex., occupying a seat in the day coach the entire distance.

To return to the accident and its cause, and the extent of plaintiff's injuries:

The witnesses for the defendant testified that there was no extraordinary shock felt in the car in which plaintiff was a passenger at the time of the accident. There are circumstances which point to the contrary. It was made known by the testimony that strong men, accustomed to ride in railroad coaches, braced themselves against the sides of seats to meet the shock caused by the derailment.

Defendant admits that the broken wheel was the cause of the accident, and that is about all that is admitted on its part.

With reference to the defects in the broken wheel—if there were defects, as stated— its contention is that they were not visible and discernible with the naked eye; that a close examination had been made of the wheels just before the train left Shreveport; and that the lesion in the wheel was not visible by proper inspection.

That was the opinion expressed by defend-

ant's master mechanic. He testified, substantially, that on examination a short time after the accident he discovered that the old crack in the wheel was fine, exceedingly fine, extending about two inches from the center of the outside of the wheel; that it was not at all apparent. He compared it to a mere hair.

There can be no question that the examination and inspection of the wheels of cars is a matter of the greatest importance. And it must be further said that, when a carrier of passengers sets up as a defense that a defect could not be discovered, it devolves upon it to prove that fact. It has the onus of proof. It should prove that the train was in good running order, and that, if there was anything out of order, it was not visible.

But the defendant did not sustain that defense. It did not succeed in proving that the fissures in the wheels were mere invisible lines.

This wreck took place just outside of the village of Haughton. A number of persons from the village repaired to the scene of the wreck. Among them were two blacksmiths, men accustomed to handle iron and to work it into different shapes. They saw the wheel. They found old cracks in the wheel measuring from 4 to 6 inches long on both sides of the axle. The wheel was broken in two equal parts, following the lines of the old cracks, and continuing on to the rim of the wheel. They said that they could see where the old cracks ended, and where the new break began. Accustomed to handle iron and steel, they testified in a direct and positive manner.

One of these blacksmiths had been nettled by the assertion of some one in his village that no one could tell an old break from a new break in iron. He said he could, and went to the trouble of procuring a small piece of iron to prove his assertion.

As a witness in court, he produced a piece of iron he had brought with him in his pocket for the occasion, in which there was a new and an old break.

The cross-examination, properly enough, made close inquiry regarding his statements and mildly reminded him that possibly the spirited controversy in which he had engaged in his village, regarding old and new breaks, prompted him to entertain exaggerated ideas upon the subject. He was asked about metallurgy, and asked regarding his knowledge or want of knowledge in that respect. It did not disconcert him. He replied that he had read some books on blacksmithing.

He held on to his theory and became slightly fraternal, though firm in the views he expressed. In answer to a question regarding his knowledge, he said:

"'Tis this way, brother, if a man can look at a thing with his own eyes, and see one part dark and another light, and then cannot tell, it is his fault, not mine."

Touching his interest in the controversy as mildly intimated by counsel, growing out of his desire to vindicate what he had said, he replied:

"Let the law take its course."

These blacksmiths had often measured iron. They were not mere novices. Besides, their testimony is corroborated, to some extent at least, by witnesses for the defendant; one in particular, who evidently thought that the crack should have been detected during the last inspection at Shreveport.

We do not doubt but that the inspector, and in fact all of the employés of the defendant company, were experienced and careful men. This we do not question. The most careful and experienced men sometimes stumble. However unavoidable moments of listlessness may be, or however slight the inattention, it is incumbent upon us to enforce well-defined rules laid down to be followed in cases, such as the one before us for decision.

The weight of the testimony on this particular point is with the defendant.

There was a break in the wheel on each side of the axle, 4 or 5 inches in length, which should not have escaped attentive inspection.

The record informs us that these examinations of wheels and of cars are made in this wise: The inspector walks up one side of each car and returns on the other, viewing the wheels as he passes. We have no fault to find with the inspectors. It does seem to us that the method which, as we understand, they are expected to follow, is faulty. It doubtless grows out of the exigency of the occasion.

The train hastily arrives at the station, where generally inspection is made. The engine is puffing and the steam escaping from the boilers. The passengers are in a hurry to leave. Time must be made. Small wonder if at times serious defects escape even the careful and diligent eye of the inspector.

The testimony to which we have referred, it seems to us, meets with some corroboration in the fact that the wheel in question went to pieces within 15 miles after the inspection had been made. It was cracked at a place exceedingly dangerous, near the axle.

The next question before us for decision grows out of plaintiff's contention that she was injured in the wreck, and that her nervous and weak physical condition thereafter was due to the jolt and fright to which she was subjected. This contention is stoutly denied by the defendant.

No question but that plaintiff was greatly frightened. For a moment she lost consciousness. Shaken and jolted, she fell back on the wooden seat, lacking a cushion, that had been pressed back during the excitement.

At that moment the passengers and railroad employés were hardly in a mood to observe and see what another passenger was doing. Plaintiff may have fallen and suffered, as she stated, without having been seen at the moment by those witnesses who said that they had not seen her badly shaken up and jolted; nor had they seen her when she was assisted, as she stated, by two men unknown to her who pulled her back on her seat. No one of the witnesses for defendant saw this. That may well happen in the break up of a train.

The statement of some of the witnesses that they did not see her, or did not see her in trouble, does not impeach her testimony and render it worthless. Their negative statements, under the circumstances, are not to be taken in preference to her positive statement.

She testified that she was hurt, but she did not know to what extent. She did not know that she was hurt at all. She did not call for the physician. Her silence on the subject of injury, her continuing on her way after cars had been provided to take the passengers, and the fact that she consulted a physician only two or three days after the accident, are all urged in the defense of the defendant company as evidence that she was not seriously injured.

Plaintiff at that point appealed to experience as laid down by medical science in aid of her cause. It is shown that there may be a latent interval after a person receives a serious shock. The person may be seriously hurt. The nervous system may be affected without its being felt.

The following is quoted from the transcript: It is taken from the text-book known as the "International Clinics." Testimony of physicians in the case was that this quotation is correct, to wit, quoting:

"It is very common for a person in an accident to appear unaffected for hours, even days, and thinking himself uninjured, and yet break down with nervous symptoms."

This is not ordinary experience, for generally those who meet with accidents are prone to exaggerate them, but it seems that there are exceptions to the general rule, and plaintiff comes within the exception.

Traumatic neurasthenia, plaintiff's complaint, is not at all ordinary in its effects, it seems. Dr. Osler, quite an authority, the evidence states, says:

"A majority of patients with traumatic neurasthenia recover."

In railway cases, so long as the litigation is pending, and the patient "is in the hands of lawyers," the symptoms usually persist. "Settlement is often the starting point of a speedy and permanent recovery." "The honest physician tries to get lawsuits off his hands, so that the patient can have the full benefit of his skill toward a more speedy recovery."

Doctors will disagree. There are others who take a different view.

Of the following there seems to be no doubt: Since the accident the patient has been frequently confined to her bed, she has lost flesh, she is physically weak; before the accident she was healthy and strong.

The evidence shows that the spinal column, that known as the coccyx, is affected. It is turned almost at right angles. This, it seems, is not serious.

The coccyx is a little undeveloped tail that does not come through the skin, composed of two or three vertebræ. We are informed by the medical experts, who testified, that this caudal appendage can be easily removed. It is sometimes removed with little pain, and the person continues in good health (as it is of no earthly use), and in that case the person is left without the least evidence upon which to base disquisitions regarding the origin of the human species, a question of great moment in the opinion of certain savants:

It appears that other of plaintiff's organs are also affected. It is not absolutely certain that this is due entirely to the accident, and the evidence might have left them out without strengthing or weakening the cause of any one.

The amount which plaintiff should recover is one of the important issues.

The jury allowed $5,000, small enough if all of plaintiff's ills were caused by the accident, but large enough, too large, if the organic troubles of which she complained are due to other causes.

There can be no absolute certainty in the matter. We think it reasonable enough to fix the amount at $5,000.

For reasons assigned, the judgment is affirmed.

MONROE, J. I concur in the decree.