SOMMERVILLE, J.
Plaintiff asks damages in the sum of $20,320 against the defendant company for an accident which happened to her on leaving one of defendant’s street cars on Peters avenue, near Pitt street, on the morning of February 24, 1914, Mardi Gras day; through the alleged fault of defendant’s employés. Defendant answers that it was without fault in the premises, and alleged that plaintiff alighted from the car, and in so doing fell, from causes unknown to defendant, and over which it had no control. There was a trial before a jury, which resulted in a verdict and judgment for $6,000 in favor of plaintiff and against the defendant; and defendant has appealed.
The evidence on the point as to whether the car started while plaintiff was in the act of alighting therefrom, or whether it was at a standstill, is very conflicting. Four witnesses for the plaintiff, including herself, testified that the car moved and threw her from the step while she was alighting from it; while three witnesses for the defendant, who saw the accident, say that the car was'at a standstill, and that the plaintiff tripped and fell from the car without any apparent fault on the part of the defendant.
The conductor and the motorman on the car both testified that neither one saw the accident. The conductor says that the car was at a standstill, and the motorman says it was in motion. The former appeared as a witness for the defendant, and the latter, for the plaintiff. Defendant seeks to discredit the testimony of the motorman by producing a signed statement made by him at, or about, the time of the accident, in which he stated that the car was at a standstill; and by showing that he was a discharged employé, with a grievance against the company. If the motorman’s testimony is disregarded, then there are three witnesses for the plaintiff, and three witnesses for the defendant, contradicting one another as to whether the ear actually stopped, while plaintiff was alighting therefrom or not.
It is unfortunate that the testimony of the conductor, on the point suggested, could not be had. But, while he testified that the car was at a standstill, he also said that he did not see the accident, because of the great crowd on the platform between him and the plaintiff. Nevertheless it was his duty to have seen the plaintiff while she was in the act of leaving the car, so as to know that she had left the car in safety, and to have signaled the motorman at the proper time. It was also his duty to have stopped the car at a safe place for the plaintiff to alight. This he did not do. He did not stop the car at Prytania street, where plaintiff requested that it should be stopped; and, when plaintiff rang the bell for Pitt street, he failed to stop the car until it had gone from 15 to 25 feet beyond the crossing. He testified that the day was a rainy one, and that the car slipped from 15 to 25 feet beyond the crossing at Pitt street, where he had been signaled to stop it. He afterwards admitted that the weather was clear, and that the car did not slide. He permitted plaintiff to alight without knowing that Peters avenue had been excavated, with the view of having a pavement laid thereon. He knew nothing about the work of laying the pavement. He permitted the nurse girl, in the employ of the plaintiff, to alight at the same place, without seeing that she carried a 15 months old child in her arms. He certainly did not give to plaintiff, a passenger on the car of which he had charge, the care to which all passengers are entitled, and particularly one in plaintiff’s condition, who was in a very advanced state of pregnancy, which condition was observed by all those who saw her.
The defendant was at fault in having in its employ, as a conductor on a street car, one who failed in all of his duties towards plaintiff, a passenger on the car; and, be *585 cause of his negligence, and contradictory statements, the jury doubtless credited the testimony of the witnesses for the plaintiff.
Defendant attacks the testimony of the witness Calvin, because, while on the stand, he was asked on cross-examination if he had made a statement, shortly after the accident, to one of the agents of the company, and he answered that he had made no such statement. The agent of the company was produced, and he testified that Calvin had made a verbal statement to him, which he had written down at the time, and in which it is stated by Mr. Calvin:
“She pushed through the crowd, and the car was at a standstill. I could not say positively if she hit the step or edge of the platform. I turned just in time to see her fall out in the street, and a negro man cried out, ‘The lady has fallen.’ ”
The witness made the same statement on the stand, on direct examination, except that he added thereto the following:
“And she (the plaintiff) was talking about not stopping the car, and then she started to step off and the car was standing still, and it started again and stopped suddenly, and then a negro man announced she had fallen down, and I stepped off the platform and found Mrs. Fuge on her hands and knees.”
It may he that the agent of the defendant failed to put down that part of the witness’ oral statement following the clause, plaintiff “started to step off and the car was standing still,” to the effect, “and it started again and it stopped suddenly.” The witness testified that if he made the statement to defendant’s agent which was attributed to him, he had no recollection whatever of having done so. The statement was not signed by him; and it evidently had escaped his memory.
On the other side, the witnesses for the defendant could not have impressed the jury very favorably. One of them who saw the accident theorized to a great extent, and testified as to what he supposed had happened, rather than to what he saw. The second witness was in the employ of the company,- and testified as to what he thought had happened. He said, in part:
The accident “must have happened that she missed her step and fell — missed her footing, and she fell.”
He also testified to the crowded condition of the platform of the car, but could not say how many persons were between him and the steps. He certainly did not have a clear view of plaintiff when she got of, because he testified that the nurse girl of Mrs. Fuge got off after Mrs. Fuge did, while all of the other witnesses testified that the nurse girl left the ear first. He also testified that the day was rainy and cold; while the other witnesses testified that it was clear. He does say that the car was at a standstill when the plaintiff alighted therefrom. The last witness for defendant was an old colored man, who evidently desired to tell the truth. He said:
“The car was stopped dead still. I know that. I don’t know whether it made a jerk after I got off or not but when I got off it was stopped.”
He, with others, had alighted from the car for the purpose of permitting plaintiff to leave it On cross-examination, he testified as follows:
“Q. Perkins, you don’t know whether the car jolted ahead and threw Mrs. Fuge off? A. No, sir; I was standing on the ground. Q. Whether she fell off or jumped off, you don’t know? A. No, sir; I don’t know that.”
And, on redirect examination, he answered as follows:
“Q. And while you were holding onto it (the car), and during the while the lady was getting out, did you feel any jerk? A. No, sir; I didn’t feel any jerk.”
[1] With this conflicting evidence before it, the jury came to the conclusion that the witnesses for the plaintiff testified truly, to the effect that the conductor signaled the motorman, and that the car was started while plaintiff was in the act of alighting; that she was thrown to the ground, and sustain *587 ed the injuries she and the other witnesses testified to. We are not prepared to say that the jury has erred; and the verdict will not be reversed on this point.
[2] Turning to a consideration of the injuries inflicted on plaintiff, and the amount of the verdict, we find that plaintiff was seriously injured; but the value or money extent of those injuries is not a matter of strict proof. And, in such cases, the court is slow to disturb the verdict of the jury, which, in this case was for $6,000.
Two years after the accident, the attending physician testified that he had treated plaintiff for a contusion of the back and left thigh, and a threatened miscarriage, and that she was at the time of the accident in an advanced stage of pregnancy. But there was no miscarriage, and the child was delivered in a normal condition at the proper time. He further testified that plaintiff was confined to her home, because of the injuries due to the accident, before the birth of the child, and that she was still suffering with traumatic neurosis, which he described as a peculiar nervous condition causing a group of symptoms of the disease; but it was impossible for him to put a limit as to the time plaintiff might suffer because of the condition of her nervous system. He would not make any prognosis as to the limit. He says that plaintiff still suffers with pains in her lumbar muscles and side as the result of the accident; that he had treated her for lumbago—
“and it is a well known fact that lumbago, brought on by traumatism, etc., when any one exercises themselves much or you have changeable weather, they usually suffer.”
Dr. De Mahy testified as a nerve specialist. To the question,
“Do you, Doctor, in your medical opinion, believe the injuries to Mrs. Huge will finally pass away, or do you believe her nervous condition will be permanent”
—he answered:
“My experience with these cases is that when a condition of this kind comes on, there may be some improvement and even an apparent cure; but the condition is predisposed; the patient may be discharged and an accident of that kind or a minor ailment or shock may re-establish the condition from which she is at present suffering.”
The defendant offered no testimony to contradict the testimony of the two last witnesses.
Before the accident, plaintiff was a strong, healthy woman. Since that time she is nervous and sick, and unable to attend to her household duties. Her injuries are due to the fault of defendant, and it must repair same. In the case of Lowenthal v. Vicksburg, S. & P. Ry. Co., 117 La. 1007, 42 South. 483, we say, in reference to a case of a woman suffering from traumatic neurasthenia:
It “is not at all ordinary in its effects, it seems. Dr. Osier, quite an authority, the evidence states, says: ‘A majority of patients with traumatic neurasthenia recover.’ ”
In that case the jury allowed $5,000 damages, and the verdict was affirmed.
Plaintiff, in this case, was rendered unconscious by her fall from the car, and she has suffered much pain. She was threatened with a premature delivery, which doubtless caused her much anxiety of mind and great fears for her health; her nervous system has received a great shock from the fall and bruises which she sustained at the time, and she is still suffering therefrom. But it would appear from the evidence that there is good reason to believe that the symptoms of the nervous system will be relieved in the course of time. We think that the verdict for $6,000 found by the jury will compensate her for the injuries sustained by her, and will be in line with the decision herein-before referred to.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be affirmed, with costs.