Statement of the Case.
MONROE, C. J.
Plaintiffs, Castille and the American Insurance Company of North America, demand $4,000, alleged to be due *641 them, in the proportions of $2,800 to the one and $1,200 to the other, by reason of a loss, resulting from a fire, said to have been caused by sparks emitted from a steam-propelled tractor owned by defendant and negligently operated by his agent without a spark arrester, whereby a building and stock of merchandise, the property of Castille, valued together at the amount sued for, and insured by his coplaintiff to the extent of $1,200, are alleged to have been totally destroyed, and which $1,200, having been paid, is here sought to be recovered by the insurer, as subrogee pro tanto of ■the claim of the assured against defendant. There was judgment in the district court in favor of plaintiffs for $3,500, and defendant has appealed.
The facts of the case as we find them, amid some conflict in the testimony, are as follows:
The building in question was originally a one-story affair, built of plank, with a gable roof covered with shingles, but with no floor or ceiling, which plaintiff had purchased from defendant some fifteen years before for $50. He had thereafter supplied those deficiencies and had added a shed, upon the rear side, which is said to have measured 7x32 feet, and had supplied counters and other fixtures, and some five or six years before the fire had bought a half interest in the premises which his brother had acquired for $80 or $90; the ground upon which the building stood not having been included in either of the transactions thus mentioned. In view, however, of the improvements, repairs, and fixtures which plaintiff had added, and of the advanced cost, in May, 1917, of the material and labor that would have been required for its reconstruction, we find the then value of the building to have been not less than $300. It stood, according to the testimony, considered together, on a public road which runs a little north by east and south by west, and hence fronted slightly south by east, and backed (if that term be permissible) slightly north by west, and, as the shed which was added to the back had a flatter roof than the main building, they formed at their junction a concave or inside angle where the main roof probably overlapped the shed roof, thus interposing an obstacle, in addition to the angle, which was likely to catch and hold sparks and cinders blown against that slope. On the trial of the case a rough diagram showing the relative positions of the store, a blacksmith shop and barn, the tractor and its track, the direction of the wind just before and at the time of the fire, a burned tree, and certain measurements subsequently made, was offered in evidence, and its accuracy and sufficiency as showing the facts that it purports to show has not been questioned, though we think it must be inaccurate, upon the immaterial point, 'that the 7x32 foot shed is drawn upon even lines with the 16x20 foot building. Annexed hereto is a reasonably faithful reproduction of that- diagram, which may assist in the elucidation of this opinion.

The fire broke out between 1 and 2 o’clock on May 28, 1917, which was a bright, sunshiny day, following six or eight weeks of extremely dry weather, spoken of as a drouth. There were in the store at the time only the plaintiff, Mrs. Aurelien Cormier, sister-in-law of defendant, and her daughter, Mrs. Dupuis.
According to the testimony of Mrs. Dupuis, about the time that she and her mother arrived at the store, defendant’s tractor was stopping at a point nearer to the black *643 smith’s, 'shop and (as otherwise shown) 66 feet northwestward from the store. How long after their arrival Mrs. Cormier did so is not shown, but it is a fact that it was she who first called plaintiff’s attention to the fire. He testifies that she told him that “the fire caught on the roof of the store; that the roof was on fire.” She testifies that she told him “his store was burning.” Being asked when she first saw the fire, she replied, “When I first seen the fire, the smoke was coming in the store from the opening in the garret, and the smoke was coming in the store.” She and her daughter at once left the store by the front door, and plaintiff went out the back door. They saw no fire on the front side, but saw smoke coming through the roof. Plaintiff (from the other side) found the fire was on the roof; “the roof was on fire; it was a flat roof; * * * it was the shed — right on the shed.” He called Roy, the blacksmith,' who came at once, went on the roof, and tried to extinguish the fire by throwing water on it from buckets, but was unsuccessful, and, with the exception of a small proportion of the stock in trade, the building and its contents were burned.
The tractor, in charge of Lejeune, engineer, accompanied by Carruthers (who is defendant’s son-in-law), had come from the southeast, using both coal and wood as fuel. It had passed the store of plaintiff’s brother, and there had afterwards been found cinders upon the floor of the gallery, no other tractor having passed. It had stopped (as has been stated) at a point 66 feet to northwest of plaintiff’s store, the purpose being to get a supply of water for the boiler. Carruthers had come to the store on that mission, and had been directed by plaintiff to a well about 3% arpents further away, and Stelly, a man in plaintiff’s employment, had been sent to aid him by providing a bucket wherewith to draw the water, which bucket was to be obtained at Stelly’s house; the house, as we take it, being near the well to which they were directed. When Carruthers and Stelly left the store, however, they went first to the tractor and joined Lejeune, and the party of three thus assembled devoted some little time to the eating of cakes which he (Carruthers) had probably obtained at the store, and then, or during that delay, according to the testimony of Stelly, they fired the engine. That testimony reads as follows:
“Q. Did you see them firing at any time? A. Yes, sir. Q. When was that? A. When they stopped and asked to give them water.”
Lejeune’s testimony on that subject reads in part:
“A. It was quite a while we stayed there [near the blacksmith’s shop] and ate two or three cakes, then went and got water from the other well, and I stayed with the machine, and I oiled the wheel. * * * Q. When you first stopped the engine, where did you stop it? A. Close to the blacksmith’s shop. Q. Did you fire your engine there that day? A. I never stirred the fire as long as I was before that door. Q: When did you fire your engine for the first time? A. Before getting to the store. Q. And then when again? A. When I was getting the water.”
Cross-examination: “Q. How long before had you fired up when you fired up again? A. If it is a good fire, it can go 25 or 30 minutes. Q. If not a good fire, how long can it go — 10 or 15 minutes? A. It depends on the fire. Q. Did you have a good fire when you'stopped at the blacksmith’s shop? A. There was a flame when I got there and when I started the steam up and it gave me a chance to go a certain distance. Q. What were you firing with, Mr. Lejeune? A. Wood and coal both. * ® * Q. Right at that time, when you stopped? A. It was mostly coal at the store; before coming there, I had a few sticks of wood and put them in.”
Carruthers, being asked about the firing, answered that he did not know; that he “had nothing to do with that.” And both he and Lejeune testified that they did not know whether the tractor emitted sparks or not, although they had operated or assisted in operating it for several years.
Before the tractor reached the place where *645 the water was to be obtained, or just at that time, and while Stelly and Carruthers were on their way to get the bucket, their attention was attracted to the fact that plaintiff’s store was on fire. Stelly says that the fire was right on the shingles, on top of the roof, about where the two roofs joined. Lejeune and Carruthers saw only the smoke coming through the shingles, but Carruthers started immediately to the scene, running until his breath was exhausted, and then walking as fast as he was able, and he says that, when he reached the store, “they were on the roof, where the lower part goes to the building, and were pumping water, and they were putting it on the roof.” Lejeune, being otherwise occupied, did not go to the fire.
The evidence is abundant and conclusive to the effect that, while the tractor was standing near the blacksmith’s shop, 66 feet from the store, the wind blew from the northwest, directly from the tractor to and over the store. It is shown that work was being done in the blacksmith’s shop, but no witness testifies that any sparks were emitted from the chimney; and there is testimony to the effect that, considering the direction of the wind, such sparks, had there been any, would have been carried against or beyond the barn, rather than against the store.
It is further shown that, when defendant bought the tractor, it was not provided with a spark arrester, but that Lejeune had put one on. He testifies as follows on that subject, to wit:
“Q. Why did you put one on? A. Just because, when I stopped, it prevented the smoke from coming out so fast. Q. And the cinders? A. I presume so. * * * Q. When did you take it off? A. I did not take it off; it just rotted away. Q. Then at that time it did not have any? A. No, sir; it did not have any.”
The “opening” mentioned by Mrs. Cormier was an aperture about two feet square leading through the ceiling of the store into the garret of the main building, and, as the ceiling was low, one could, by standing upon a box, reach it sufficiently to be able to put things through into the garret, which, however had no floor upon the joists, and only such things were disposed of in that way as small empty boxes, egg cartons, excelsior, etc.
A witness called by defendant testified that he had worked for plaintiff several years before the fire, and that plaintiff then kept matches in the garret. Another witness, called by plaintiff, testified that he had lived in plaintiff’s house during the eight months immediately preceding the fire, and that he was very particular to keep matches only in certain safe places in the store beyond the reach of rats or mice, and plaintiff and his wife deny that matches were ever kept in the garret. Mrs. Castille, by whom plaintiff’s books were kept, was examined at very great length in an effort to show that there were so many errors in the books that they could not be relied on as basis for the establishment of the value of the merchandise.
We are of opinion that the effort was unsuccessful. The alleged errors appear to us to be those of the counsel, arising, in part, from their failure to compare the matter copied from the books into the transcript with the books themselves, and, in part, from their failure to allow for the fact that Mrs. Castille is not, and did not pretend to be, an expert bookkeeper.
The items to which counsel particularly refer are explained in the brief of plaintiff’s counsel, which satisfies us that the value of the property burned has been fairly determined by the trial judge.
Opinion.
Our conclusion is that the fire was ignited by sparks or cinders emitted by defend *647 ant’s tractor, which, being carried by the wind against the northwest slope of the roof of plaintiff’s store, were caught and held at the junction of the upper and steeper roof of the main building with the lower and flatter roof of the shed, and that, in all probability, the roof first mentioned overlapped the other, and after the ignition, the smoke and fire found their way beneath as well as above the surface of that roof, and, the wood being dry, by reason of the protracted drouth, the progress of the fire was very rapid. We find it unnecessary to decide whether the engine of the tractor was fired while stopped near the store or not, though the testimony of Stelly upon that point is direct and affirmative, while that of Lejeune is indirect and negative, and we are at a loss to know why Carruthers, who was there, should not have been able to say whether it was or was not then fired.
It is admitted that firings took place shortly before and shortly after the stop in question, and that they were required very frequently — possibly at intervals of 10 or 15 minutes — and neither of the witnesses was able to deny that the engine emitted sparks and cinders. Rather to the contrary, defendant himself, being asked by his own counsel whether it threw out sparks, answered, “I guess it threw out a little,” and, asked whether it had caused any fire in threshing (rice), replied, “Not that I know of, not that I seen,” while the engineer, to a similar question, answered, “Not that I remember.”
On the other hand, the engineer admits that he found it advisable to put in a spark arrester, and, though his first statement was that he did so because it stopped the smoke from coming so fast, he presumed, when questioned on the subject, that it also stopped the cinders.
We have held heretofore that it does not follow, because a fire occurs after an engine has passed, that the one happening is the necessary consequence of the other, but we have not held that, where a fire occurs, the ignition of which is explicable by the proximity of an engine capable, through negligence, of emitting sparks and cinders, and upon no other theory which has any support in the facts, it is necessary, in order lo entitle the owner of the burned property to recover, that he should have followed the spark or cinder from the engine to the property and watched the process of ignition. Tortorice v. Yazoo & M. V. R. R. Co., 142 La. 232, 233, 76 South. 620; Lemann Co. v. Texas & P. R. Co., 128 La. 1089, 55 South. 684; Thomason v. Kansas City S. R. Co., 122 La. 995, 48 South. 432; Brady v. Jay, 111 La. 1074, 36 South. 132; Meyer & Co. v. Railroad Co., 41 La. Ann. 641, 6 South. 218, 17 Am. St. Rep. 408.
And so in this case the engine in question has been shown, as we think, to have been capable of emitting sparks and cinders; its position was such, within a short time before the fire broke out, that if it did so, the sparks and cinders would have been carried by the then prevailing wind in the direction of the unusually dry roof upon which the fire was ignited, and that they had to be carried but 66 feet in order to reach the roof, which was so arranged that it was likely to catch and detain them, under conditions most favorable to the accomplishment of the mischief of which they were capable. On the other hand, neither of the other theories proposed by defendant’s counsel, find any support in the facts. It is true that a wind blowing from the blacksmith’s shop in the direction of the store might have carried sparks and cinders emitted from the chimney of the shop to the roof of the store, but it is shown that there was no such wind, and it is not shown that there were any such sparks, or that the blacksmith had ever found it necessary to put in a spark arrester. It is also true that, if there had been matches in the garret of *649 the store, they might have been ignited by rats or mice, and that the fire might have been started there; but it is shown that there were no matches in the garret, and that the fire did not start there. To which it may be added that there is no suggestion that there was fire in the store, or in the vicinity, other than that in the blacksmith shop, to which the fire that destroyed the store could be attributed. The testimony shows that the store was well stocked with goods, and establishes the value of that which was burned with reasonable certainty.
The judgment appealed from is therefore affirmed.