No. 4138

Second Circuit

(Second Division)

———

KOCH v. SOUTHERN CITIES DISTRIBUT-
ING CO. ET AL.

———

(December 9, 1931. Opinion and Decree.)
(January 14, 1932. Rehearing Refused.)
(February 8, 1932. Writs of Certiorari and
Review Refused by Supreme Court.)

———

Jackson & Smith and F. A. Blanchard, of Shreveport, attorneys for plaintiff, appellee.

Barnette & Roberts, of Shreveport, attorneys for defendant, appellant.

Herold, Cousin & Herold, of Shreveport, attorneys for defendant A. & J., Inc.

CULPEPPER, J. A. & J., Incorporated, own a building three stories high, divided into three stores, at the corner of Louisiana avenue and Milam street, Shreveport. La., all fronting on Milam street, known generally as the Saenger building. The corner store was occupied by the Hawkins Drug Company, Inc., of which plaintiff was president.

On the morning of January 12, 1930, plaintiff came to the store about 7 a. m., opened it up, and lighted the coffee urn. Underneath the building there is a basement. There was a trapdoor leading from the drug store into the basement, and which was kept closed. The gas meter which measured the natural gas that supplied the store was located in the basement, as were the carbonic acid gas tank and frigidaire, both connected with the fountain. Each of these contrivances had an electric motor attached to it.

Frank Malloy, who worked at the soda fountain, arrived at the store at about 7:20 a. m., shortly after the plaintiff arrived. He complained to the plaintiff that he smelled a disagreeable odor, and, thinking possibly it was fumes from a formaldehyde bottle left open, he and the plaintiff examined it and found it closed. The plaintiff testified that he was suffering from a cold and did not smell the odor. Frank Hicks, who was in the basement a day or two before the explosion, complained to Mr. Hawkins of being conscious of the basement being stuffy and causing a headache.

A few minutes past 10 o'clock a terrific explosion took place in the basement of the drug store, which was so violent that it almost completely wrecked the building. The floors were pushed up, and the walls were pushed out. Some of the soda fountain equipment was thrown across Louisiana street. Malloy, who was working behind the soda fountain, was hurled into the street. Plate glass windows in the furniture store on Milam street, and glass windows in the second-story of the City Hall building, across the street, were broken. In this explosion plaintiff received severe injuries.

A. & J., Incorporated, the owner of the building, and the Southern Cities Distributing Company, hereinafter referred to as the Southern Company, having the franchise to distribute natural gas in general consumption in Shreveport, were made defendants. One of the six-inch mains of the Southern Company had been laid under the pavement in Louisiana street parallel with the Saenger building, but across the street about six feet from the curb. A service tee was inserted in this main opposite the drug store, and a service line or lateral connected with this tee was projected across the street to the sidewalk in front of the drug store. In order to project this line, and to avoid digging up the pavement across the street, the sidewalk in front of the drug store was excavated to the wall, and a two-inch pipe was cut in six-foot sections, inserted in the excavation, and was jacked or forced across the street, just under the pavement. The wall, or a concrete pier, of the Saenger building was used against which to set the jack. These six-

foot lengths of pipe were fastened together as each section disappeared under the street pavement. When the end finally reached the main, at the place desired, it was somewhat lower than the main, and it had to be lifted to connect with the tee which had been inserted in the main.

About a year and a half before the explosion there had been a fire in the Saenger building which made it necessary largely to reconstruct it. The old service pipe which had been in use before the fire had been laid across the street to the main in substantially the same place as the main which was in use at the time of the explosion. Instead of removing this old service pipe or lateral, when the new lateral was placed, it was left where it was, and is referred to in the testimony as a dead pipe with both ends open. One end of this pipe was just inside the curb in front of the drug store, while the other end was some twelve or fifteen inches from where the present service lateral connected with the main.

The curb cock was set in the pavement in front of the Saenger building on Louisiana street. It was set in place by the Southern Company, is owned by it, and is a device for shutting off the gas. From the curb cock through the remaining sidewalk and into the building the pipes were installed by the owner of the building. This work was done by Mr. Earl C. Schavey, a licensed plumber of Shreveport. When the house service pipes were installed, it was necessary to again excavate the sidewalk to the wall of the building and effect an entrance into the basement of the building, so that the sidewalk at this point was twice excavated, the holes twice refilled, and the sidewalk twice replaced, some eighteen months before the explosion.

On account of the extreme violence of the explosion and of the damage done both to persons and property, both defendants began investigations to determine, if possible, its cause. A. & J., Incorporated, called in Mr. Schavey, who had installed the plumbing in the building, including the gas pipes. The Southern Company had recourse to its own organization which is equipped for that kind of work.

Nowhere in this voluminous record has there been but two causes assigned for this explosion. One of these was the accumulation of natural gas in the basement; the other being sewer gas accumulated in sufficient quantities in the basement to cause an explosion. The experts all agree that natural gas is always explosive when confined, as it undoubtedly could have been in this basement, and ignited, whereas sewer gas sometimes is explosive and sometimes not, depending upon whether sufficient methane is found therein, and likewise confined as it could have been in this basement and ignited.

The representatives of both defendants made some preliminary investigation on the day of the explosion, which was a Sunday. The Southern Company started in earnest the next morning after the explosion and continued for a week or ten days. Mr. Schavey did some little work on Sunday, and possibly on Monday and Tuesday following, but did not do much work until the following Wednesday.

Both defendants continued active until what they considered all relevant facts that might have had some bearing on the explosion were developed. Mr. Si. Hazelmeyer, who had installed the service lateral in use at the time of the explosion, was active in the investigation for the Southern Company, as was also Mr. Lytle, general

foreman of that company, Mr. McBride, the general superintendent, Mr. Smith, the superintendent of operation and construction, and Mr. Hamilton, the claim agent and valuation engineer. They made all sorts of tests in that vicinity. On Wednesday morning Mr. Schavey made a test at the curb box on the sidewalk by pouring water down around the curb box and a series of bubbles came up. After dinner he went over to the point where the service lateral was connected with the main. There is some conflict in the testimony as to whether there was a depression in the street at this point, but the preponderance of the testimony, we think, is that there was. Mr. Schavey said he was impressed with this depression, which he describes as about three feet square, and was at the point where the service lateral joined the main. He then drilled, or needled, a hole partly through the pavement at this point, and gas came out. It was set on fire, and blazed up about eighteen inches.

Representatives of the city, the Southern Company and A. & J., Incorporated, were all present and took part in what followed. A hole was then again dug at the curb that afternoon at the curb cock at the Saenger side of the street by the Southern Company's representatives, about three feet square and about thirty inches deep, and no gas was found to escape. It had been raining, however, since they had dug the previous hole, and the bottom of the hole was full of mud. A test was made to ascertain if gas was escaping by applying a flame, but with a negative result. The end of the old dead lateral or service pipe was then cleared of mud, the hole on the other side of the street stopped up, the light applied, and the gas flowing through this old lateral then blazed up with a roar.

An excavation was then made at the point where the service lateral joined the main. The service tee inserted in the main was found kicked out, and left leaning toward Milam street. A small portion of the main was flaked off of the main where the tee was screwed in, but on the opposite side of the tee from Milam street. About three or four threads of the tee where it had been screwed into the main were bright. The remaining seven or eight threads were rusty.

The case was tried before a jury. A verdict was returned in favor of the plaintiff against the Southern Company, for $35,995, the full amount sued for. The demands against the other defendant, A. & J., Incorporated, were rejected. A motion for a new trial was filed by the defendant cast, which was overruled, and it alone appeals.

The record is voluminous. The oral testimony covers over six hundred typewritten pages. It will therefore be impossible to discuss in detail the testimony of each witness without drawing this opinion out to an inordinate length, although it has been carefully considered in connection with the able briefs and oral arguments of counsel representing all parties.

The testimony clearly establishes, as nearly as human testimony can make certain any controverted fact, that the damage complained of was not caused by an explosion of sewer gas. In fact the very able and resourceful counsel of the Southern Company does no more than suggest that it was possible for sewer gas to cause this explosion. We think it is clear that if it had been possible for sewer gas to cause this explosion, it would have been incumbent upon the Southern Company, in view of the gas leak in its main which was found, to establish not only that a sewer gas leak was present in or near this basement, but that such sewer gas was of the

explosive kind rather than the innocuous sort that would not explode, and that this sewer gas rather than natural gas was the cause of the explosion. No sewer gas of any kind was found by any one.

But every one agrees that natural gas, when confined, is highly explosive, and a leak in the gas main of the Southern Company was found and its movement was positively traced, after the explosion, to within twelve feet of the basement of the Saenger building.

Counsel for the Southern Company strongly urge that "plaintiff was never able to get the gas nearer than twelve feet of the building." This argument is based upon the fact that the sidewalk is twelve feet wide and the end of the dead lateral service pipe came just inside the curb, where the gas did come through from the main on the City Hall side of Louisiana street to the hole excavated at the curb cock in the sidewalk.

But it is in evidence that excavations had twice been made in the sidewalk when natural gas was installed in the building about eighteen months before the explosion. One excavation was made by the Southern Company in order that the jack or device used for forcing the pipe across the street to the six-inch main might rest against the wall or concrete pier of the Saenger building. The other was made by Mr. Schavey, the plumber, when he connected the house pipe with the curb cock, at the curb box, installed by the Southern Company. The soil of these excavations, when repaired and the sidewalk replaced over it, was not replaced as compactly as it was originally.

Moreover, witnesses for defendant testify that, frequently in the process of jacking or forcing this service lateral across the street, it sometimes took five or six efforts before the pipe would be projected to the right point for connecting with the main, so that undoubtedly holes would be left in the earth alongside this lateral as a result of each failure, in addition to this old dead lateral itself, which had also been left parallel with the new lateral.

Counsel for the Southern Company very strongly urge that the break found at the connection of the service line or lateral and the gas main was itself caused by the explosion. But we cannot agree with that conclusion. The service tee has from ten to twelve threads, and the tee itself tapers slightly from where the threads begin to the end of the tee. This makes it necessary for the tee to be screwed into the main snugly to prevent its becoming loose. The Southern Company admits that from the bright appearance of the threads on the tee it was not inserted into the main more than four or four and a half threads.

The weight of the testimony we think establishes that the insertion of the service tee only three or four threads into the main was not a proper connection. And we are impressed that, if the tee had been screwed in deeper so that it would have fitted in snugly and close into the main, it would not have "kicked" out. If the force of the explosion had been sufficient to disconnect the tee from the main some thirty-five or forty feet distant from the explosion, if screwed into the main properly, there would have been either a rupture of the threads, or a break completely through the main, and not just a thin flake off the surface, and the city engineer of Shreveport so testifies, and we are greatly impressed by his testimony.

There is no testimony from any source that the threads on this tee were either stripped, or even slightly ruptured. It is

contended that the small flake broken from the main and estimated to be from one-eighth to one-fourth inch thick, would enable the tee to be "kicked" out without rupturing the threads, but the shell of the main is 45/100 of an inch thick. If the tee had been screwed in tight and snug into the main, for anything like the number of threads on the tee, this force, we think, whatever it was, would have either stripped or ruptured the threads, or broken the shell of the main as deep as the threads were inserted, or, what is most likely, would have at all times held firm with no resultant leak whatever. This flake which had broken out represents, we think, the full depth to which the tee was inserted into the main. Besides, in screwing the tee into the oval surface of the main, the bright threads on the tee would not be uniform in number all the way round as if screwed into a flat surface.

A careful consideration of the testimony has convinced us that this break took place before the explosion, caused probably by traffic over the pavement, and that the leaking gas therefrom found its way either through this old dead service lateral, or through the perforations under the pavement made by the act of forcing the new lateral under the pavement, to where it connected with the main. The surface of the street was a perfect seal, preventing the escape of the gas upward, and the sidewalk was almost, if not equally, effective, except possibly for the cover of the curb cock. If this dead service lateral was open at both ends, as it was, or if, as the testimony shows, several holes were punctured under the pavement, and no water could penetrate immediately beneath the pavement to seal these fissures or punctures, as seems likely, then there would be two excellent means, either being effective, by which the escaping gas could get to, and under the sidewalk. The sidewalk, as we have seen, had been excavated in order to jack this pipe across the street. This excavation, we infer from the testimony, was followed by another excavation soon after, to enable the plumber to run the pipe from the curb cock into the building. In replacing this pavement, the earth beneath was left more or less loose with the gas pipe and possibly fissures running through it that would enable the gas to penetrate the soil and pass through it to, and between, the concrete piers into the basement of the building. And while some of the gas might have escaped through the cover in the curb cock, still the close fitting cover and the fine dust and sand in the interstices around the curb box cover would no doubt effectively shut off a part of it, while the rest undoubtedly found its way into the basement of the building. And this conclusion is readily arrived at in the absence of any other source from which the gas could have come.

Natural gas confined within the basement could have caused this explosion. If this tee was disconnected before the explosion, as we think it was, the gas could have been conveyed perfectly to within twelve feet of the building, and we think could also have penetrated, and did penetrate and pass through, the loose soil from this point under the sidewalk into the basement.

The Southern Company contends that plaintiff has not proven that the explosion was caused by escaping gas, that it belonged to defendant, or that it escaped through its negligence, and that all of these essential facts must concur and be proven with legal certainty before he can recover.

We think the evidence fairly establishes that the explosion was caused by the accumulation of natural gas in the basement of

the building. And we also think that the evidence establishes that the escaping gas belonged to appellant, and that it escaped from the break where the service tee connected with the gas main.· And this train of circumstances was brought about, and was, we think, the evidence establishes, the direct result of appellant's negligence in improperly fitting this service tee in the gas main.

That some three or four of the threads of this service tee were bright adds weight to the conclusion that, due to the improper connection at the main, it had become disconnected just long enough before the explosion to admit of enough escaping gas flowing to the basement to fill it with gas, and that it was set off by some agency in the basement, probably by an arc from one of the electric motors installed therein.

But it is not necessary that plaintiff should, after establishing that there was a leak in appellant's main in close proximity to the building with a perfect conduit for the escaping gas to within twelve feet of the building, then follow the escaping gas inch by inch into the basement of the building. In the case of Castille v. Cormier, 144 La. 640, 81 So. 210, 213, the Supreme Court held that "it does not follow, because a fire occurs after an engine has passed, that the one happening is the necessary consequence of the other, but we have not held that, where a fire occurs, the ignition of which is explicable by the proximity of an engine capable, through negligence, of emitting sparks and cinders, and upon no other theory which has any support in the facts, it is necessary, in order to entitle the owner of the burned property to recover, that he should have followed the spark or cinder from the engine to the property and watched the process of ignition."

Natural gas is a dangerous agency. Its distribution is accompanied by many possible dangerous consequences, and it is therefore well established that a higher degree of care and vigilance is required in dealing with such agency than is required in the ordinary affairs of life. A degree of care commensurate to the danger involved is required of a distributor of natural gas to avoid injury and damage and, in case of failure to exercise such care, and injury results, it is liable.

In the case of Feely v. National Packing Co., 141 La. 903, 75 So. 837, 839, there were two defendants charged with negligence which caused an explosion similar to the one at bar. One of them was charged with permitting ammonia fumes to escape which, it was charged, caused the explosion, and the other defendant was charged with permitting Pintsch gas to escape. The court held in that case that the explosion could not have come from the ammonia, just as we hold here that the explosion from the evidence adduced, could not have come from sewer gas. After the explosion, a leak was found in the Pintsch gas pipe under the sidewalk, and just above this leak was a six-inch terra cotta drain from the cooling room which had a hole in it. The gas pipe was incased in cement four inches thick and additionally in wooden boxing. From this the gas company argued the improbability of the gas penetrating these substances and through packed earth for nine to twenty-four inches, and reaching the hole in the drainpipe. In passing upon the facts thus set out, the court said:

"In view of the evidence establishing positively that this explosion could not have come from the ammonia, and in view of the absence of all source from which it could have come other than this Pintsch gas, and in view of the fact that to several of the witnesses the odor in question was that of Pintsch gas, we have come to

the conclusion that this Pintsch gas was the cause. * * *"

The case of Wolff v. Shreveport Gas, Electric Light & Power Co., 138 La. 743, 70 So. 789, 791, L. R. A. 1916D, 1138, was one involving an explosion resulting from a leaking gas pipe in a basement of a building on Texas street in the city of Shreveport. The injuries resulting from the explosion were to a passerby on the street in front of the building. The explosion was held to have resulted from a leaking gas pipe, which to use the language of the court, "was very thin and covered with rust, which, by the jarring of the floor, might have been shaken off, leaving pits or holes through which the gas could escape."

Under the facts thus disclosed, which we think were as strong for the defendant, if not stronger, than are the facts for the appellant here, the court held the gas company liable.

The jury allowed the plaintiff the full amount sued for, $35,995, which amount, we think, is excessive. Plaintiff, at the time of his injuries, was 38 years of age, enjoying good health, and was earning $250 per month. The explosion rendered him unconscious. He was lacerated and torn about the body, and his nose and right foot broken. The lacerations, contusions, and bruises about the body were so numerous that, when the wounds were dressed, he was scarcely recognizable by his friends. He remained in the hospital for about a month, was taken home, where he remained in bed two months more. At the date of the trial, some fifteen months later, he was under the care of a specialist for his nervous condition and a bone specialist for his foot. His nervous condition is such that he is compelled to take sedatives to induce sleep. We infer from the testimony that he is now almost a nervous wreck, and that it will be a long time before he can recover, if he ever can. In the meantime, he has endured and will continue probably for a long time to come to endure great physical pain and mental suffering. We have concluded to fix the amount of the judgment at $15,000, for the injuries received, plus the expenses incurred to the date of filing the suit, which amount to $995.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by reducing it to $15,995, and, as thus amended, it be affirmed; the plaintiff to pay the cost of appeal, and all other costs to be paid by the appellant.

PER CURIAM. In our opinion rendered on December 9, 1931, in this case, wherein it was decreed that the amount of the award granted plaintiff in the lower court, namely, $35,995, with five per cent per annum interest thereon from January 10, 1931, until paid, was amended by this court by reducing said amount to $15,995, we failed to mention or include interest. This was purely an oversight on the part of this court, as it was the court's intention to include the legal rate of interest on the principal amount awarded, from judicial demand until paid.

Plaintiff has filed a motion calling the court's attention to the fact that our decree failed to include interest on the principal sum awarded, and now asks that same be included. Accordingly, we now decree that legal interest be included on the said amount of $15,995, awarded by us, from judicial demand until paid; plaintiff to pay cost of appeal and all other costs to be paid by the appellant.

The application by appellant for a rehearing is refused.