## BARLOW v. SOUTHERN CITIES DISTRIBUTING CO.

No. 4618.

Court of Appeal of Louisiana. Second Circuit.

June 30, 1933.

Rehearing Denied July 15, 1933.

Jackson & Smith and Chas. L. Mayer, all of Shreveport, for plaintiff.

Ben F. Roberts and J. C. Smith, both of Shreveport, for defendant.

TALIAFERRO, Judge.

This case was heretofore remanded by us to the district court for new trial as between plaintiff and Southern Cities Distributing Company, 146 So. 357. The pleadings and the evidence then in the record are summarized and discussed in that opinion. These will not again be commented on, except as may be necessary to this opinion.

Before the second trial below, the defendant filed a plea of prescription of one year in bar of plaintiff's suit. It is alleged in this plea that the cause of action arose. January 12, 1930, and that plaintiff's suit was filed January 9, 1931, but was not served on defendant until January 13, following. It is further alleged that section 66 of Act No. 250 of the Legislature of Louisiana for the year 1928, is unconstitutional, null, and void, in that it violates section 16 of article 3 of the Constitution of 1921; that said law embraces more than one object, and the title of the act does not indicate that the object of the Act is to deal with the law of prescription of actions; that the title is broader than the act and does not indicate the object expressed in said section 66.

This act is also attacked by a formal plea as being discriminatory against defendant, a corporation, in that it attempts to establish one rule of prescription for corporations and another rule for individuals, and therefore violates the Fourteenth Amendment to the

Constitution of the United States and deprives defendant of the equal protection of the law. Both of these pleas were overruled by the lower court. By consent, all of the evidence introduced on first trial of the case was introduced as evidence at second trial. Additional testimonial proof was adduced by both sides. There was judgment for plaintiff for the same amount as was awarded him at conclusion of first trial. Plaintiff appealed devolutively, and defendant suspensively. The case is again before us for final disposition.

### Plea of Prescription.

In its brief defendant states that this plea is good unless the saving clause in section 74 of Act No. 250 of 1928 preserves section 27 of Act No. 267 of 1914. This section 27 provides that in all suits against corporations, foreign or domestic, prescription shall be interrupted by the filing of the suit in the court of competent jurisdiction of the action against the corporation. Section 66 of the 1928 act is identical with section 27 of the 1914 act. Section 74 of the 1928 act, being the repealing and saving clause, reads: "The following laws or parts of laws are hereby expressly repealed: Act 158 of 1874; Act 267 of 1914, except insofar as concerns those parts of said law relating to foreign corporations that at the time this Act goes into effect may be in force as therein enacted or as amended by subsequent laws," etc.

Defendant is a foreign corporation. Therefore the saving clause of the 1928 act, as to it, preserves intact section 27 of the 1914 act, and even though the 1928 act should be declared unconstitutional in the respect attacked by defendant, still the 1914 act would be in force on the question of the interrupting of prescription by filing of petition in proper court. The lower court, we are informed by defendant, so held. We think the ruling correct.

Defendant does not refer to or discuss in this court its other plea. We assume it has been abandoned. It will be so treated.

### Merits.

The record in this case has grown to be of huge proportions for a lawsuit. We have studied the evidence adduced on the second trial, and refreshed ourselves on that introduced at the first trial. It will serve no useful purpose to discuss in detail the testimony of the numerous witnesses who gave evidence in the case, nor attempt to reconcile evidence patently hopeless in contradictions, some of which bristles with glaring discrepancies. As stated in our former opinion, there are two questions of fact involved in the case: (1) Was plaintiff injured by the explosion of the gas in the Saenger Building on January 12, 1930? and, (2) if so, the nature, extent and duration and effect of such injuries.

The question of liability has long since ceased to be an open one.

We are convinced beyond any doubt that plaintiff was in the building at the time of the explosion, and it naturally follows, from the nature of the explosion and damage done to the building, that he was injured. Mr. Koch, the manager of the drug store operated in the building, testified at the second, but not at the first trial. He said plaintiff made a purchase from him, and, as he (Koch) turned aside to wait on another customer, lighting a match at the same time, the explosion occurred. Another witness saw plaintiff crawling through the crumbled walls of the building, while another testified that he saw him running around on the street, acting as though he were dizzy, with blood on his face and other parts of his body. Mr. E. G. James, a policeman, says he was a block away from the explosion and hastened to the scene, and assisted in removing one of the injured men from the shattered walls, and, as this man was being placed in an ambulance, plaintiff ran up, with blood on his face and legs. He caught him, remarking to some one, "Here is a fellow looks like he is crazy, or something," and then put him in a car to be carried home. Plaintiff reached home before 11 o'clock. The explosion occurred about 10 o'clock. Many of his neighbors and friends called at the home that day to render assistance, all of whom are in accord as to plaintiff's actions and appearance then.

Dr. Bodenheimer was telephoned, but did not arrive until about noon. Touching plaintiff's condition at that time, Dr. Bodenheimer said:

"Q. Doctor, will you state what you found his condition to be at that time? A. He showed apparently that he was suffering from a shock and he was suffering from contusions over his entire body. He was in a highly nervous state, his mind was hazy.

"Q. Now what did he do if anything to convince you of his condition in that respect. Do you remember anything that he did? A. He would get up and down, talked in a disconnected sort of way, altogether his looks and mind denoted that his mind was not clear.

"Q. Did you attribute his condition to that explosion? A. I did.

"Q. Do you know for a certainty? A. I might add this, knowing the facts, I would attribute it to that, but could not prove a thing. All I can say is that he evidently suffered from some accident, and knowing the facts I connected the two.

"Q. Doctor, do you recall whether or not he had any teeth missing? A. I think that he had one or two teeth missing at the time.

"Q. You do not remember definitely how many? A. No, sir. I do not remember defi-

nitely how many, but my recollection is that there was loss of a tooth or teeth.

"Q. Can you state whether or not they had been recently lost? A. Yes, sir, they were recently lost. There was evidence of fresh blood and raw surface that denoted that. * * *

"Q. Did you find anything in his condition that would indicate to your mind that he was suffering from any concussion? A. Yes."

He also testified at the second trial. He then thought plaintiff's condition partially due to local infection, but all conditions he found could not be ascribed to that; that it was impossible to eliminate trauma as a contributing cause of plaintiff's many troubles. He examined plaintiff a few days before the second trial and found his heart enlarged, the apex of it displaced, mashed to one side and inflamed, tonsils infected, positive signs of babinski, and a pulse beat of 110.

The next day following this visit of Dr. Bodenheimer, Mrs. Barlow sought to have him again come to see plaintiff, but, being unable to get in touch with him, summoned Dr. McIntyre, who thereafter treated plaintiff until he was able to get about. Dr. McIntyre, of plaintiff's condition, says:

"Q. What did you find his condition to be? A. Well, he looked like he had suffered a shock and nerve injury, awful nervous, irritable, fussy, looked like he was flighty, could not reason with him. His family complained that he was more or less irritable, complained of severe headaches and was nauseated and on examination had abrasions about over the body.

"Q. Doctor, do you know how long he remained in and about his home? A. About three months.

"Q. Did you treat him? A. Yes, sir, made two or three calls a day out there for a while.

"Q. After he was able to leave home, did you continue to treat him? A. Yes, sir, I think I examined him a few times after he was able to come to the office, and I recommended that he get a nerve specialist to treat him, as I had done all that I could do.

"Q. Do you know whether or not he got a nerve specialist? A. I don't believe that he did. He told me that he did not have any money, and the question rocked along, for all I know."

It will be noted that Dr. McIntyre treated plaintiff about three months during which time he remained about the home.

Dr. R. C. Young, whose work is limited to nervous and mental diseases, examined plaintiff March 15, 1932, just prior to first trial, and says of his condition then:

"Q. Will you just state what condition you found him in at that time? A. Well, I found that Mr. Barlow had suffered a definite brain injury, showed definite clinical neurology symptoms.

"Q. What for instance did you find? Just state to the court what your findings were. A. Diagnosis as to the cause of brain injury at the time is concussion, small hemorrhages, and there is evidence of small hemorrhages of the brain, which affect their equilibrium.

"Q. Did you distinguish that in his case?

A. In his case there are certain signs that are absolutely conclusive. He is nervous and quivering all the time. Heart is unusually fast. Pains run from the forehead to the middle of the shoulders and is present all the time. Does not sleep, wakes with a start. Worries regarding his condition and his inability to work. Has dizzy spells, during which time he feels as though he is falling forward; afraid of heights, blue and depressed; cries fairly easy. Nervous and irritable at all times. Gets fatigued easily. Sees double at times on looking to the extreme right or left with smearing of images in looking directly ahead. Tremor of the eyelids and tongue and hands. Enlargement of veins of the eyes, indicative of slight increase in intracranial pressure. Positive babinski. * * *

"Q. Doctor, assuming that this man is a painter and decorator, what have you to say as to whether or not his ability to follow that occupation has been affected by his condition? A. I would say that the man is permanently disabled from following that occupation any more due to the fact that he has involvement of the cerebellum, giving him a distorted sense of falling, which gives him the idea of losing his equilibrium which would make it rather dangerous for him, and of course he has diplopia, and he might reach for a rope overhead and the false imagination, and seeing double would make it dangerous.

"Q. Doctor, would that man be justified in accepting employment at this time, where he would have to perform services on a scaffold or a platform above the ground? A. It would be dangerous and I would advise him against it.

"Q. In your opinion, will he ever be able to do that kind of work again? A. No.

"Q. What have you to say as to whether or not the condition that he has now is permanent or temporary? A. The majority and rule of neurology is that the maximum amount of improvement will take place in brain and spinal cord injuries in six to eight months, and that after that time there is very little hope of ever regaining normality of the functions and the chances are that the condition will be permanent."

Dr. Young is certain plaintiff's disability is permanent. His condition when the second trial was had is confirmatory of Dr. Young's opinion expressed twelve months before.

There is in the record considerable testimony of other physicians and of another nerve

specialist which is contradictory, to some extent, of that given by Drs. Bodenheimer, McIntyre, and Young, but, as the testimony of these physicians, who testified for plaintiff, is strongly supported by an abundance of lay evidence and by plaintiff's own nervous and physical condition, we feel justified in accepting same as correctly reflecting plaintiff's condition immediately after he was injured, and as establishing the permanent character and effect of such injuries.

In passing, it is pertinent to add, as bearing upon this whole matter, that in the Koch Case, 18 La. App. 664, 138 So. 178, and in the Malloy Case (La. App.) 142 So. 718, growing out of this explosion, it was the contention of defendant, supported by testimony of practically the same physicians and nerve specialists as testified in this case for defendant, that those plaintiffs were not injured in the manner and to the extent complained of by them (and which were in the main of the nature and character plaintiff herein sues for), and that their condition when their cases were tried was not traceable to the explosion. In both of these cases defendant's theory of the proximate cause of the plaintiff's injuries was rejected.

It is shown beyond question that plaintiff suffered from no serious physical or mental ailment before he was injured. He had been treated for stomach trouble prior to that time, but was pronounced well of that by his physician. At the second trial he testified, and his wife corroborated him, and there is no evidence in the record seriously contradicting it, that he was nervous, suffered from insomnia, jumps in his sleep, and was twelve pounds lighter than at the first trial. The day before the last trial he only weighed 115 pounds. He was in the military service of the United States during the World War, and was of robust physique until injured. His teeth were good.

The evidence clearly shows that plaintiff was confined to his bed for about ten days after he was injured, and that he suffered mental and physical pain intensely during that time, and to a lesser extent for many weeks thereafter. He was compelled to remain about his home for three months. Before he was injured, he earned $175 per month as an interior painter and decorator. His ability to perform work of this character is largely, if not totally, destroyed, because he cannot now safely work on ladders or scaffolds very far above the ground.

Ten days after plaintiff was injured, at the request of his wife, Dr. Houston, a dentist, came to their home and examined plaintiff's mouth. He found one tooth entirely out, one broken off and several others loose. The gums were badly lacerated. The nature of the wounds and the mouth's condition indicated that the trauma was of recent occurrence. The teeth were sound and unaffected by disease. Dr. Houston prescribed treatment to relieve these conditions, and on February 4th plaintiff personally visited his office for further service. Two of the loose teeth and the root of the one broken off were removed. Thereafter, one bridge was put in, but for lack of means plaintiff did not have other needed work done.

Plaintiff admits, with little exception, receiving pay from the Washington-Youree Hotel Company where he had worked regularly for six years prior to being injured for all of the month of January and February and for first six days in March following the explosion. He denies that he worked there a single day after being hurt. His explanation of these payments to him is that, on account of his long and satisfactory service to the hotel company, he was carried on its pay roll, though absent from work, until March 6, when some labor dispute arose and his name was dropped from the roll. This version of the matter is correct, or else he was carried on the pay roll through error of the hotel company. The evidence of his neighbors, on all sides, and others, conclusively establishes that he did not work at the hotel after January 12, 1930.

Some testimony was introduced at second trial, as was done at first trial, to the effect that plaintiff did do service at the hotel after the explosion. This evidence is not all in accord as to when plaintiff returned to work. Some witnesses say he returned the following Monday. While others say he reported back later in week. When the first trial was had, over two years had elapsed since the explosion, and the second trial was over three years thereafter. It would be most remarkable for fellow workmen to recall, under such conditions, whether one of their number actually worked during a given time or not. On the other hand, the fact that a large building of a city had been destroyed from a mysterious explosion of natural gas and several persons therein were seriously injured, would impress any one who saw the effect of the explosion on the building, or one or all of those injured, in such way that they could recall distinctly, after the passing of many years, who of the injured they had seen, or the nature of the damages to the building.

The trial judge allowed plaintiff in first judgment $1,500 for loss of four teeth, $200 for doctor's bills, and $30 for dental bill. The second judgment was for the bulk sum of $1,730, presumably composed of the same items as were included in the first judgment. No amount was allowed for pain and suffering or loss of earning capacity.

In Long v. American Express Company, 150 La. 184, 90 So. 563, 22 A. L. R. 1493, an award of $500 to a boy 10 years old for loss of two front teeth, was increased to $1,500.

Malloy was given judgment for $4,000. We doubt that he was injured as badly as plain-

tiff, or that the effect of his injuries was as far-reaching in its damage to the nervous system and physical make-up as the injuries sustained by plaintiff. However, we think $4,000 allowance to plaintiff will be fair and equitable. Lowenthal v. Vicksburg, S. & P. Railway Co., 117 La. 1007, 42 So. 483; Kight v. Vicksburg, S. & P. Railway Co., 142 La. 357, 76 So. 799.

For the reasons assigned, the judgment appealed from is amended by increasing the amount thereof to $4,000, and, as amended, said judgment is affirmed.